IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 17, 2013 Session

# KIM BROWN v. CHRISTIAN BROTHERS UNIVERSITY

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-001227-11      Robert S. Weiss, Judge**

**No. W2012-01336-COA-R3-CV - Filed August 5, 2013**

This is an appeal from the trial court's grant of a directed verdict, dismissing Appellant's claims of: (1) slander/defamation; (2) false light invasion of privacy; (3) false imprisonment; (4) malicious harassment; (5) negligent supervision, hiring, and retention; (6) negligent failure to affirm identification; (7) negligence; (8) assault and battery; and (9) civil conspiracy. Appellant also raises issues concerning the scope of cross-examination and the admission of certain evidence. We conclude that the trial court did not abuse its discretion concerning either the scope of the cross-examination, or by excluding certain evidence. We further conclude that Appellant failed to put forth sufficient evidence to make out a *prima facie* case for any of the foregoing claims. Accordingly, we affirm the trial court's grant of a directed verdict. Affirmed and remanded.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J.,W.S., and DAVID R. FARMER, J., joined.

Kim Brown, Memphis, Tennessee, Pro Se.

Stephen W. Vescovo and Margaret F. Cooper, Memphis, Tennessee, for the appellee, Christian Brothers University.

## OPINION

### I. Facts and Procedural History

This case involves incidents that occurred on February 27, 2011 and March 9, 2011 on the campus of Appellee Christian Brothers University ("CBU"). Appellant, thirty-nine-year-old Kim Brown, who was a former CBU student (in 2006), was on-campus allegedly doing research when he ran into a current student, Jennifer Sharp. Mr. Brown, who had led Ms. Sharp to believe that he was a twenty-two or twenty-four year old current CBU student, and that his name was Ken Brown, invited Ms. Sharp to lunch off campus. Mr. Brown and Ms. Sharp left campus in his vehicle. When they returned to campus, Mr. Brown drove through the Central Avenue entrance.

At that time, CBU police officer Kevin Shaver was manning the guard booth. Mr. Brown stopped at the booth, and was asked to produce identification. Ms. Sharp, who was in the passenger seat, showed her current student identification and Mr. Brown handed Officer Shaver his (approximately nine-year-old) CBU identification card. Because Mr. Brown did not have a student parking pass, he was instructed by Officer Shaver to go to the Office of Campus Safety to procure a sticker. Officer Shaver, thinking that Mr. Brown was a current student (as he had represented) also instructed him to have a new identification card made at campus security.

Officer Shaver radioed another security officer, Officer Jaffe, and requested that Officer Jaffe meet Mr. Brown at campus security to assist him with getting a new parking decal and student identification card. Mr. Brown parked his car, got out, and walked with Ms. Sharp toward campus security. While walking, Mr. Brown suddenly broke into a run; Ms. Sharp testified that she could hear Officer Jaffe yelling at Mr. Brown to stop, but that he continued to run into the IT Building, which is where the security office is also located. Officer Jaffe and Officer Shaver proceeded to search the building for Mr. Brown, although Mr. Brown testified that he was not aware that the officers were looking for him.

Mr. Brown's next encounter with CBU security was on March 9, 2011, when Mr. Brown again attempted to enter the CBU campus through the Central Avenue entrance. He was stopped by Officer Shaver and was asked to produce his identification card. Mr. Brown testified that he did not remember whether he proffered the card, but Office Shaver recognized Mr. Brown from the February 27 incident. Officer Shaver asked Mr. Brown to pull his car over and then asked Mr. Brown if he had any outstanding warrants. Mr. Brown stated that he did not. Although he was never arrested, Mr. Brown was temporarily handcuffed and detained while Officer Shaver completed his investigation of Mr. Brown's "odd and suspicious" behavior. After having Mr. Brown checked through the police department's national criminal data base for warrants, and finding none, Mr. Brown was released and instructed not to return to campus until he arranged a meeting with the campus police chief to explain his behavior the prior month.

On March 14, 2011, Mr. Brown filed suit against CBU, arising out of the foregoing events. Mr. Brown filed his first amended complaint on March 30, 2011, alleging thirteen causes of action: (1) slander/defamation; (2) false light; (3) false imprisonment; (4) false arrest; (5) malicious harassment; (6) negligent supervision; (7) negligent training; (8) negligent failure to affirm identity; (9) negligent infliction of emotional distress; (10) intentional infliction of emotional distress; (11) negligent retention; (12) assault and battery; and (13) civil conspiracy. Mr. Brown's *ad damnum* requested $50 million in compensatory damages and $50 million in punitive damages for each cause of action, amounting to a total of $1.3 billion in damages. On April 28, 2011, CBU filed an answer to the amended complaint, denying the material allegations contained therein.

The case was tried before a jury on June 11, 2012 through June 13, 2012. At the close of Mr. Brown's proof, CBU moved for a directed verdict on the ground that Mr. Brown had failed to meet his burden of proof on any of the his claims. In response, Mr. Brown admitted that his claim for "false arrest" was the same as his claim for false imprisonment. He also non-suited his claims for intentional infliction of emotional distress and negligent training. After hearing arguments on the motion for a directed verdict, the trial court orally granted the motion on June 13, 2012, dismissing all remaining causes of action. The order granting CBU's motion for a directed verdict was entered on June 22, 2012. Mr. Brown filed a timely notice of appeal.

Following the grant of CBU's motion for a directed verdict, Mr. Brown filed a motion for permission to purchase or split the purchase of the trial transcript for purposes of appellate review. CBU objected to the motion on the ground that CBU had arranged for the stenographer and had paid for the stenographer's services. CBU argued that Mr. Brown "did not participate in reserving the stenographer and did not express any interest in the trial transcript until the motion for directed verdict was granted." By order of July 17, 2012, the trial court denied Mr. Brown's motion. Thereafter, on August 13, 2012, Mr. Brown filed a proposed statement of the evidence adduced at trial pursuant to Tennessee Rule of Appellate Procedure 24(b). On September 4, 2012, CBU filed an objection and motion to strike Mr. Brown's proposed statement of the evidence. By order of November 9, 2012, the trial court denied CBU's motion in part, and granted it in part, stating:

> ORDERED, ADJUDGED AND DECREED that the *voir dire* and opening statement sections of [Mr. Brown's] Statement of the Evidence shall be stricken and not included in the record on appeal. IT IS FURTHER ORDERED that the transcript of the cross-examination testimony of Kim Brown and the entire testimony of Officer Kevin Shaver and Jennifer Sharp shall be approved as part of the record on appeal, and [Mr. Brown's]

Statement of the Evidence setting forth the testimony of the cross-examination of Kim Brown, testimony of Officer Kevin Shaver, and testimony of Jennifer Sharp shall be stricken and not included in the record.

On December 7, 2012, Mr. Brown filed a motion requesting that this Court permit the appellate record to be supplemented. This Court entered an order on December 19, 2012, remanding the case to the trial court for the limited purpose of determining whether the appellate record should be supplemented. Although the trial court initially denied Mr. Brown's request to supplement the record, the parties ultimately agreed to include a transcript of the trial court's June 13, 2012 oral ruling on the motion for directed verdict. A consent order granting the motion to supplement the record was filed in the trial court on May 24, 2013, and a copy of the transcript of the trial court's June 13, 2012 ruling was submitted for inclusion in the appellate record. No further objection has been filed concerning the content of the appellate record. Accordingly, our review is limited to those portions of the transcripts that were approved for inclusion by the trial court.

## II. Issues

Mr. Brown appeals. He raises three issues for review as stated in his brief:

1. Whether the court erred in granting CBU's Motion for Directed Verdict on the slander, false light, assault, battery, false arrest, false imprisonment, malicious harassment, civil conspiracy, negligence, and negligent failure to affirm identity claims.[1]

2. Whether the court erred by allowing CBU to bring up previous litigation after Brown objected.

3. Whether the court erred in not allowing Brown to call the phone number during trial that

---

[1] As previously stated, Mr. Brown non-suited his claims for intentional infliction of emotional distress and negligent training. Accordingly, he does not dispute their dismissal on appeal. *See Payne v. Savell*, No. 03A01-9708-CV-00352, 1998 WL 46454, at *2 (Tenn. Ct. App. Feb. 5, 1998) (noting that, when a party takes a voluntary nonsuit, the parties cannot appeal the resulting order of dismissal); *Martin v. Washmaster Auto Ctr., Inc.*, No. 01-A-01-9305-CV-00224, 1993 WL 241315, at *2 (Tenn. Ct. App. July 2, 1993) ("No present controversy exists after the plaintiff takes a nonsuit."). In addition, Mr. Brown does not raise as an issue the trial court's dismissal of his negligent infliction of emotional distress claim. Accordingly, we will likewise not consider the dismissal of that claim on appeal. *See* Tenn. R. App. 13(b) ("Review generally will extend only to those issues presented for review.").

is listed in the incident report, and in not allowing the video evidence to even be introduced, which shows cars coming into CBU's campus without being stopped by security.

Before turning to the issues, we first note that we are cognizant of the fact that Mr. Brown has proceeded *pro se* throughout these proceedings. It is well settled that *pro se* litigants are held to the same procedural and substantive standards to which lawyers must adhere. As explained by this Court:

> Parties who decide to represent themselves are entitled to fair and equal treatment by the courts. The courts should take into account that many *pro se* litigants have no legal training and little familiarity with the judicial system. However, the courts must also be mindful of the boundary between fairness to a *pro se* litigant and unfairness to the *pro se* litigant's adversary. Thus, the courts must not excuse *pro se* litigants from complying with the same substantive and procedural rules that represented parties are expected to observe.

*Jackson v. Lanphere*, No. M2010-01401-COA-R3-CV, 2011 WL 3566978, at \*3 (Tenn. Ct. App. Aug. 12, 2011) (quoting *Hessmer v. Hessmer*, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003)).

We begin our analysis with the procedural issues (i.e., Issues 2 and 3 above) raised by Mr. Brown.

### III. Procedural and Evidentiary Issues

### A. Previous Lawsuits

In his second appellate issue, Mr. Brown asserts that the trial court erred in overruling his objection to cross-examination questions that were asked by CBU's counsel regarding several other lawsuits that Mr. Brown had filed. The transcript of this portion of the cross-examination provides:

> Q. Mr. Brown, I believe when we ended yesterday, according to my notes the last thing you said was you brought this suit yourself as an inspiration. Do you recall that?
>
> A. I recall, yes, sir.

     \*                      \*                     \*

A. I did say that, and also because I felt I'd been wronged also.

Q. Sure, sure, sure. And if you feel like you've been wronged, you feel like you need to do something about it.

A. Yes, sir.

Q. In fact, over the last few years you've felt like—

MR. BROWN: I object to that testimony, your Honor. I know what he's about to say and it's got nothing to do with this.

    \*                     \*                    \*

Q. Well, let me get my question out. Okay?

A. Go ahead.

Q. In fact, you've felt wronged a whole bunch of times over the last two or three years, and every time you've felt wronged, you take it upon yourself to sue entities, don't you.

    \*                     \*                    \*

MR. BROWN: Your Honor, I just object to that [line of questioning concerning other lawsuits filed by Mr. Brown]. That has nothing to do with this case right here.

MR. VESCOVO [Attorney for CBU]: Mr. Brown said yesterday that he filed this lawsuit as an inspiration. He opened the door.

THE COURT: Mr. Vescovo, we're going to narrow this a little bit. You can ask him what other lawsuits he's filed and who the parties were, but we're not getting into any of the details about any of those cases.

Thereafter, Mr. Vescovo proceeded to ask Mr. Brown about several other lawsuits that he had filed against other entities.

It is well-settled in Tennessee that "[t]he propriety, scope, manner, and control of the examination of witnesses is a matter within the discretion of the trial judge, which will not be interfered with in the absence of an abuse thereof. A wide discretion in this matter is necessarily left to the court." *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948). Consequently, "the determination of the propriety of questions on cross-examination is very largely in the discretion of the trial court, subject, of course, to correction for plain error or evident abuse of discretion." *Davis v. Wicker*, 333 S.W.2d 921, 923 (Tenn. 1960). A trial court abuses its discretion when it has applied an incorrect legal standard or has reached a decision which is against logic or reasoning that caused an injustice to the party complaining. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tennessee Rule of Evidence 403, however, states that: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

Concerning the admissibility of evidence pertaining to a party's involvement in other lawsuits, 1 McCormick On Evidence § 196 (Kenneth S. Braun ed., 7th ed. 2013) states, in relevant part, that:

> Should a party be permitted to cast doubt on the merits of the claim at bar by demonstrating that an opponent has advanced similar claims or defenses against others in previous litigation? Inescapably, two conflicting goals shape the rules of evidence in this area. Exposing fraudulent claims is important, but so is protecting innocent litigants from unfair prejudice. The easy cases are those in which one of these considerations clearly predominates. If the evidence reveals that a party has made previous, very similar claims and that these claims were fraudulent, then almost universally the evidence will be admissible despite the dangers of distraction and time-consumption with regard to the quality of these other claims, and despite the general prohibition on using evidence of bad character solely to show conduct on a given occasion. At the other pole, if the evidence is merely that the plaintiff is a chronic litigant with respect to all sorts of claims, the courts consider the slight probative value overborne by the

-7-

countervailing factors. This evidence they usually exclude.

*Id*. (footnotes omitted).

Even if we allow, *arguendo*, that any evidence concerning prior lawsuits filed by Mr. Brown was not germane to the instant lawsuit, a party may "open the door" to admission of otherwise inadmissible evidence. As discussed in 31A C.J.S. Evidence § 353 (2013):

> Where evidence which might be inadmissible under strict rules is nevertheless introduced into the case through inadvertence or otherwise, the adverse party is or may be entitled . . . to introduce evidence on the same matters lest he or she be prejudiced, it sometimes being stated that the adverse party "opened the door" for the introduction of such evidence. The party who first introduces improper evidence cannot object to the admission of evidence from the adverse party relating to the same matter.
>
> \*                             \*                             \*
>
> The rebuttal or explanation evidence must be evidence of the same type or character as that sought to be rebutted or explained . . . . The doctrine does not permit the indiscriminate introduction of like evidence touching other issues, or permit matters not relevant to the issues on trial to be brought out, its use being limited to the refutation of adverse inferences created by irrelevant evidence.
>
> The admission of evidence to refute the earlier inadmissible evidence is not a matter of absolute right, but rests in the sound discretion of the court, which will not permit a party to introduce evidence, which should not be admitted, merely because the adverse party has brought out some evidence on the same subject, where the circumstances are such that no prejudice can result from a refusal to go into the matter further.

*Id*. (footnotes omitted).

In the instant case, the ground for allowing evidence of previous lawsuits was that Mr. Brown "opened the door" for this evidence to be used on cross-examination as a means of

impeaching Mr. Brown for his statement on direct examination that he filed the instant lawsuit to be an "inspiration" for the students he teaches. As noted above, only portions of the transcript of the evidence were submitted as part of the appellate record. As is relevant here, the record contains only the cross-examination of Mr. Brown and does not contain the testimony adduced on direct examination. We note, however, that even on cross-examination, Mr. Brown does not dispute that he did state that the instant lawsuit was filed for "inspiration" purposes. Generally, in the absence of a transcript or Statement of the Evidence, this Court must presume that the trial court's decision is correct. This Court in ***Outdoor Management LLC v. Thomas***, 249 S.W.3d 368 (Tenn. Ct. App. 2007), explained:

> It is well settled that, in the absence of a transcript or statement of the evidence, there is a conclusive presumption that there was sufficient evidence before the Trial Court to support its judgment and this Court must therefore affirm the judgment.

*Id*. at 377. From the record, we presume that whatever statements Mr. Brown made on direct examination concerning his motive for filing this lawsuit or any others was sufficient to "open the door" for impeachment of Mr. Brown on cross-examination by allowing CBU to question him concerning other lawsuits. Accordingly, we cannot conclude that it was an abuse of discretion for the court to allow evidence on the filing of these lawsuits, or for it to limit the line of questioning to exclude the particulars surrounding those lawsuits.

### B. Denial of Evidence

In his third appellate issue, Mr. Brown argues that the trial court erred in not allowing him to dial a phone number for the jury and to introduce a video at trial. Generally in Tennessee, a trial court's ruling on the admissibility of evidence is within the sound discretion of the trial judge. Further, trial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant. A trial court's evidentiary ruling will only be overturned on appeal upon a showing of abuse of discretion. *See **Otis v. Cambridge Mut. Fire Ins. Co.***, 850 S.W.2d 439, 442 (Tenn. 1992). Again, our review of this issue is limited by the truncated transcript contained in the record. Mr. Brown's direct testimony is not included in the record and, in particular, those portions of the transcript concerning his attempt to dial the phone number and the offer of the video are excluded. Accordingly, and as discussed above, in the absence of this evidence, we must presume that the trial court's decision was properly supported by evidence in the record. Therefore, from the record, we cannot conclude that exclusion of this evidence was an abuse of discretion.

### IV. Directed Verdict

As noted above, Mr. Brown took a voluntary non-suit as to his claims for negligent training and intentional infliction of emotional distress, and also admitted that his false arrest claim was subsumed in the false imprisonment claim. The trial court subsequently granted a directed verdict on all remaining causes of action. These claims include: (1) slander/defamation; (2) false light invasion of privacy; (3) false imprisonment; (4) malicious harassment; (5) negligent supervision, hiring, and retention; (6) negligent failure to affirm identification; (7) negligent infliction of emotional distress; (8) assault and battery; and (9) civil conspiracy. Before addressing the grant of directed verdict on each of these causes of action, we turn to review the general standard of review applicable to all directed verdicts.

Tennessee Rule of Civil Procedure 50 governs motions for a directed verdict and states:

> A motion for a directed verdict may be made at the close of the evidence offered by an opposing party or at the close of the case. The court shall reserve ruling until all parties alleging fault against any other party have presented their respective proof-in-chief. A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made. A motion for a directed verdict which is not granted is not a waiver of trial by jury even though all parties to the action have moved for directed verdicts. The order of the court granting a motion for a directed verdict is effective without any assent of the jury.

A motion for a directed verdict provides a vehicle for deciding questions of law; the question presented is whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide. *Burton v. Warren Farmers Co-Op.*, 129 S.W.3d 513 (Tenn. Ct. App. 2002). Appellate courts must conduct a *de novo* review of a trial court's ruling on a motion for a directed verdict, applying the same standards that govern the trial court's determination. *Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 281 (Tenn. 2005) (citing *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003)). A directed verdict cannot be based upon speculation, conjecture, guesswork, or a mere spark or glimmer of evidence. *Bandeian v. Wagner*, 970 S.W.2d 460 (Tenn. Ct. App. 1997). A directed verdict is appropriate only when evidence, viewed reasonably, supports only one conclusion. *Remco Equipment Sales, Inc. v. Manz*, 952 S.W.2d 437 (Tenn. Ct. App. 1997); *Pettus v. Hurst*, 882 S.W.2d 783 (Tenn. Ct. App. 1993). If "reasonable minds could . . . differ as to the conclusions to be drawn from the evidence," the motion must be denied. *Eaton v. McLain*,

891 S.W.2d 587, 590 (Tenn.1994). Motions for a directed verdict require more certainty and proof than do motions for an involuntary dismissal. *Smith v. Inman Realty Co.*, 846 S.W.2d 819 (Tenn. Ct. App. 1992). In reviewing a motion for a directed verdict, courts must take the strongest legitimate view of the evidence against the directed verdict and must deny the motion in any case where all reasonable persons would not reach the same conclusion. *Smith v. Inman Realty Co.*, 846 S.W.2d 819 (Tenn. Ct. App. 1992); *Brown*, 181 S.W.3d at 281; *Gaston*, 120 S.W.3d at 819. Only if there is no material evidence in the record that would support a verdict for the plaintiff under any of the plaintiff's theories, may the trial court's action in directing a verdict be sustained. *Jamestowne on Signal, Inc. v. First Federal Sav. & Loan Ass'n*, 807 S.W.2d 559 (Tenn. Ct. App. 1990). Accordingly:

> To avoid a directed verdict under Tenn. R. Civ. P. 50, the non-moving party must present some evidence on every element of its case—enough evidence to establish at least a *prima facie* case. *See Harrogate Corp. v. Systems Sales Corp.*, 915 S.W.2d 812, 818 (Tenn. Ct. App. 1995). Normally, a directed verdict is proper only where no material evidence exists on one or more elements that the non-moving party must prove. *See generally Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995). Whether the trial court should have directed a verdict presents [the appellate court] with the legal question of whether material evidence was introduced on every element sufficient to create a jury issue.

*Richardson v. Miller*, 44 S.W.3d 1, 30 (Tenn. Ct. App. 2000).

## A. Slanderous Defamation

In Tennessee, the tort of defamation encompasses both libel and slander. In this case, Mr. Brown's defamation claim is for slander only. Slander is "the speaking of base and defamatory words which tend to prejudice another in his reputation, office, trade, business, or means of livelihood." *Little Stores v. Isenberg*, 172 S.W.2d 13, 16 (Tenn. Ct. App. 1943). To establish a *prima facie* case of defamation, a plaintiff must prove that: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Hibdon v. Grabowski*, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005) (citing *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn.1999) (relying on Restatement (Second) of Torts § 580 B (1977))).

Publication to a third party is an essential element of a claim for slander. *Little Stores*,

172 S.W.2d at 16. "Publication is a term of art meaning the communication of defamatory matter to a third person. In the case of slander, 'publication' occurs when the defamatory matter is spoken." *Quality Auto Parts Co. v. Bluff City Buick*, 876 S.W.2d 818, 821 (Tenn. 1994) (internal citations omitted). In addition, "only statements that are false are actionable [in a defamation case]; truth is, almost universally, a defense." *West v. Media Gen. Convergence, Inc.,* 53 S.W.3d 640, 645 (Tenn. 2001). Finally, to establish any type of defamation claim, whether slander or libel, the claimant must prove that the defamation resulted in injury to the person's character and reputation. *Quality Auto Parts Co.*, 876 S.W.2d at 820 (citing *Little Stores*, 172 S.W.2d at 16). "To be actionable, the alleged defamatory statement must 'constitute a serious threat to the plaintiff's reputation.'" *Davis v. Tennessean*, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001) (quoting *Stones River Motors, Inc. v. Mid–South Publ'g Co.*, 651 S.W.2d 713, 719 (Tenn. Ct. App.1983)). "It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation." *Spicer v. Thompson*, No. M2002-03110-COA-R3-CV, 2004 WL 1531431, at *5 (Tenn. Ct. App. July 7, 2004) (citing *Gobin v. Globe Publ'g Co* ., 649 P.2d 1239, 1243 (Kan.1982); 50 Am.Jur.2d Libel and Slander § 2 (1995)). Damages from false or inaccurate statements cannot be presumed; actual damages must be sustained and proved." *Davis,* 83 S.W.3d at 128 (citing *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 419 (Tenn. 1978)). "When looking at damages for a defamation suit this court has stated that, 'the issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering.'" *Murray v. Lineberry*, 69 S.W.3d 560, 564 (Tenn . Ct. App.2001) (citing *Myers v. Pickering Firm, Inc.*, 959 S.W.2d 152, 164 (Tenn. Ct. App. 1997)).

Here, the allegedly slanderous statements involve statements of the campus police officers to Jennifer Sharp, requesting that she let them know if Mr. Brown contacted her, and suggesting that it may not be in Ms. Sharp's best interest to socialize with Mr. Brown. Mr. Brown also cites the fact that the officers questioned Ms. Sharp as to Mr. Brown's identity and the reason why he ran from them. Finally, Mr. Brown cites a statement made to Ms. Sharp by the police officers that someone was stealing books and that it was a possibility that Mr. Brown was the culprit. In addition, Mr. Brown contends that a photo of him, which was posted around the CBU campus, was defamatory. The factual allegations giving rise to Mr. Brown's defamation claim in this case are similar to those asserted by him in the recent case of *Brown v. Mapco Express*, 393 S.W.3d 696 (Tenn. Ct. App. 2012), perm. app. denied (Tenn. Jan. 8, 2013). In *Brown v. Mapco*, Mr. Brown sued Mapco as a result of a verbal exchange between Mr. Brown and the Mapco clerk:

> On November 22, 2009, Plaintiff/Appellant Kim Brown ("Brown") went to a gas station in north Memphis owned by Defendant/Appellee Mapco Express, Inc. ("Mapco"). When

Brown entered the store, he told the clerk behind the counter, Mapco employee Mary Tyler ("Tyler"), that he wanted $5 worth of gas and then handed Tyler a $20 bill. Allocating $5 for Brown's gas, Tyler gave him $15 in change.

According to Brown, a life-altering verbal exchange with the Mapco employee then ensued. The record contains security-camera video, taken inside the Mapco store, of the incident at issue involving Brown, Tyler, and another Mapco employee behind the counter, Lashunna Aldridge ("Aldridge"). During the conversation, unidentified customers came in and out of the Mapco store.

Dissatisfied with the type of bill denominations he received from Tyler, Brown asked her to give him different denominations. Tyler declined. Brown then indicated that he no longer wanted to purchase gas and asked for a refund or return of his $20 bill.

According to Brown, the response to his request by Tyler and Aldridge included the following: (1) "Naw Naw Naw"; (2) "No I'm not fina give you nothing back"; (3) "what is you tryna do?" (4) "He tryna do a money-switch"; [] (5) "we don't play that in here, unh, unh, Go! Go!" and (6) "Go pump your gas." Brown alleges that, at one point, Tyler said she was going to call the police. Brown was apparently eventually given back his $20, and as he left the store, he told the Mapco employees that he intended to call a manager the next day. Tyler allegedly then responded, "I don't care nothing 'bout you calling my manager, you don't come in here doing nothing like that."

*Id*. at 699 (footnotes omitted). In ***Brown v. Mapco***, this Court noted that whether words are capable of carrying a defamatory meaning is a matter for the trial court to decide as a matter of law. *Id*. at 708. In ***Brown v. Mapco***, Mr. Brown relied upon the clerk's statements: "what is you tryna do?;" "we don't play that;" "he tryna do a money-switch;" the clerk's verbal threat to call the police, and the clerk's accusation that Mr. Brown had committed a crime. This Court held that such statements may have been rude, annoying, embarrassing or disagreeable, but they did not rise to the level of defamation. *Id*. at 709. Likewise, the statements cited as grounds for slander in the instant case do not hold Mr. Brown "up to public hatred, contempt or ridicule." ***Stones River***, 651 S.W.2d at 719. Accordingly, as a

matter of law, we hold that the statements on which Mr. Brown bases his claim were neither false nor defamatory.

Moreover, as noted by the **Brown v. Mapco** Court, although allegedly defamatory statements may have been overheard by others, this fact may not constitute "publication" for purposes of the tort: "In light of the fact that all of the customers who wandered in and out of the store are unidentified, the elements of publication and damage to reputation are likely not met as well." **Brown v. Mapco Express**, 393 S.W.3d at 709; *see further* Prosser and Keeton on Torts § 112, p. 798. Here, the allegedly slanderous statements were made only to Ms. Sharp, and there is no evidence that anyone else overheard the statements. Concerning the photo that was allegedly posted on the CBU campus, the record simply reflects that the campus security officers brought a picture of Mr. Brown to the writing center where Ms. Sharp worked on campus. There is no evidence that this photo was "published" in any public forum. In sum, the record fails to establish that the statements made by campus security posed a serious threat to Mr. Brown's reputation, nor is there evidence to suggest that the statements opened him up to public contempt or ridicule. Accordingly, we can only conclude that Mr. Brown failed to state a *prima facie* case for slander, and that the trial court correctly granted a directed verdict on this cause of action.

### B. False Light Invasion of Privacy

Tennessee recognizes four types of invasion of privacy: "(a) unreasonable intrusion upon the seclusion of another . . . (b) appropriation of the other's name or likeness . . . (c) unreasonable publicity given to the other's private life . . . (d) publicity that unreasonably places the other in a false light before the public . . . ." Restatement (Second) of Torts § 652A(2) (1977); *see, e.g.,* **Givens v. Mullikin**, 75 S.W.3d 383, 411 (Tenn. 2002). Here, Mr. Brown's cause of action for invasion of privacy involves only an allegation of false light publicity. In **West v. Media Gen. Convergence, Inc.,** 53 S.W.3d 640, 645 (Tenn. 2001), the Tennessee Supreme Court expressly recognized the tort of false light invasion of privacy as set forth in Section 652E of the Restatement (Second) of Torts, which defines this tort as:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977).

From our review of his appellate brief, it appears that Mr. Brown treats his claims of false light invasion of privacy and slander as the same cause of action. In *West*, our Supreme Court acknowledged that, "[w]hile the law of defamation and false light invasion of privacy conceivably overlap in some ways, we conclude that the differences between the two torts warrant their separate recognition." *Id*. at 645. In *Secured Fin. Solutions, LLC v. Winer*, No. M2009-00885-COA-R3-CV, 2010 WL 334644, at *4 (Tenn. Ct. App. Jan. 28, 2010), *perm. app. denied* (Tenn. Aug. 25, 2010), the plaintiff's false light claim against the defendant was based on an email to a business associate and an oral statement to another business associate, both of which allegedly implied that the plaintiff's business was being shut down by regulators. *Id*. In *Winer*, this Court held that the email failed "as a matter of law, to satisfy the 'publicity' requirement of the tort of false light invasion of privacy," because the communication was made to a single person:

> 'Publicity' . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.
> Thus it is not an invasion of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons.

*Winer*, 2010 WL 334644 at *4. Applying the rationale set out in *Winer*, and based upon the fact that the statements at issue in this case were made only to Ms. Sharp, we conclude, as a matter of law, that the evidence is not sufficient to meet the "publicity" requirement for a claim of false light invasion of privacy.

In his brief, Mr. Brown cites a footnote from this Court's opinion in *Brown v. Mapco*, which states that "the publicity requirement for a false light claim may be satisfied by establishing that the false and highly offensive information was disclosed to a person or persons with whom the plaintiff has a special relationship." *Brown v. Mapco*, 393 S.W.3d at 707 n.4 (citing 62 A Am. Jur. 2d Privacy §141). The "special relationship" exception to the publicity requirement was explained in *Poulos v. Lutheran Social Services of Illinois, Inc.*, 728 N.E.2d 547 (Ill. Ct. App. 2000), which was cited in 62A Am. Jur. 2d Privacy §141. In *Poulos*, the plaintiff, a school teacher, was investigated for sexual abuse of one of the

foster children in plaintiff's care. *Id*. at 552–53. The ***Poulos*** plaintiff alleged that the social worker, who was employed by the defendant, contacted the chairman of the board of the school where plaintiff was employed and advised the chairman of the allegations of sexual abuse that had been made against the plaintiff. *Id*. The plaintiff was subsequently fired by the school. *Id*. at 552. The plaintiff was eventually cleared of all charges of sexual abuse. *Id*. The Illinois appellate court found that the plaintiff had a special relationship with the board chairman because he was responsible for hiring and firing decisions for the plaintiff's employer, the school. *Id*. at 556.

The case at bar is distinguishable from ***Poulos***. First, the allegations of sexual abuse made in ***Poulos*** would be highly offensive to a reasonable person. Further, in ***Poulos***, there was a "special relationship" between the plaintiff and the board chairman because he made the decision to terminate the plaintiff's employment. Here, Mr. Brown claims to have a "special relationship" with Ms. Sharp based upon the fact that they had been friends for approximately a year and one-half, and that they had been to lunch on several occasions. There is no evidence to suggest that Mr. Brown and Ms. Sharp were anything other than, at most, friends. When questioned, Mr. Brown stated that he had never been to Ms. Sharp's home; in fact, when asked, Mr. Brown could not state where Ms. Sharp lived. Ms. Sharp testified that she was not comfortable letting Mr. Brown know where she lived.

Viewing the evidence in the light most favorable to Mr. Brown, as we must do when reviewing a directed verdict, it is clear that Mr. Brown did not have a "special relationship" with Ms. Sharp, as that term is used and defined in ***Poulos***. Accordingly, the officers' statements to Ms. Sharp, without dissemination to any other person, do not satisfy the publicity requirement necessary to sustain a cause of action for false light invasion of privacy. Accordingly, we conclude that the trial court correctly granted a directed verdict on this cause of action.

### C. False Imprisonment

To successfully prosecute a claim of false arrest and imprisonment, the plaintiff must prove "(1) the detention or restraint of one against his will and (2) the unlawfulness of such detention or restraint." ***Coffee v. Peterbilt of Nashville, Inc.***, 795 S.W.2d 656, 659 (Tenn. 1990). "False imprisonment is the intentional restraint or detention of another without just cause." ***Little Stores v. Isenberg***, 172 S.W.2d at 16. Like the tort of malicious prosecution, false imprisonment requires that the defendant must have acted without probable cause. ***Brown v. SCOA Industries, Inc.***, 741 S.W.2d 916, 919–20 (Tenn. Ct. App. 1987) (citations omitted).

In ***Brown v. SCOA***, the plaintiff's son was suspected of shoplifting from the

defendant's store. *Id*. at 917–18. The plaintiff's son was observed removing a cassette tape from the store's shelf and placing it in a paper bag in his pocket. *Id*. The plaintiff and her son were detained by store employees for questioning, and the plaintiff's son was later charged with shoplifting. *Id*. at 918. After he was acquitted at trial of the shoplifting charge, the plaintiff filed suit against the store for malicious prosecution and false imprisonment. *Id*. On appeal, this Court determined that the trial court should have granted a directed verdict to the defendant on the false imprisonment claim because the facts demonstrated that the defendant's employees had probable cause to believe that the plaintiff's son had shoplifted. *Id*. at 919–20. The Court noted that to sustain a claim for false imprisonment, the plaintiff must establish that the defendant acted without probable cause. *Id*. In *Brown v. SCOA*, the Court concluded that "reasonable minds could not conclude other than that [defendant's] employees had probable cause when they detained [the plaintiff's son] for shoplifting," and therefore the trial court should have directed a verdict on the false imprisonment claim. *Id*. at 920.

Turning to the record in this case, in its June 13, 2012 oral ruling on CBU's motion for directed verdict, the trial court stated:

> Based on the facts in the most favorable light to the Plaintiff I find that reasonable minds could not find that there was false imprisonment. Based on the information that the police officers had, based on the two incidents, the two dates that were in question, that raises a sufficient amount of concern, question for the police officers and once the Plaintiff had the opportunity to explain the situation he was released. So I find that there was no false imprisonment.

We agree with the trial court. It is clear that CBU's security officers had probable cause to detain Mr. Brown. As set out in detail above, on February 27, 2011, Mr. Brown showed the officers an old student identification card. At that time, Mr. Brown was thirty-seven years old and had not been a CBU student since 2006. The record further indicates that Mr. Brown did not obtain a parking decal or an updated identification card as he was directed to do by Officer Shaver. Instead, Mr. Brown chose to flee when he was approached by the campus officers. Then, on March 9, 2011, Mr. Brown returned to the CBU campus, where he was recognized by Officer Shaver as the person who had evaded the officers on February 27. At that point, Officer Shaver detained Mr. Brown, holding him in the police booth "for around 30 minutes" according to Mr. Brown's testimony. During this time, Mr. Brown was handcuffed while Officer Shaver searched the database for any outstanding warrants.

In the first instance, there is no proof that Mr. Brown was actually arrested by anyone. The proof establishes only that he was briefly detained by CBU's security officers while they investigated whether Mr. Brown posed a threat to campus security. Based upon Mr. Brown's behavior on February 27 and his second attempt to gain access to CBU's campus on March 9, we conclude that reasonable minds could not differ that the officers had probable cause to temporarily detain Mr. Brown pending their investigation. Accordingly, we conclude that Mr. Brown has failed to set forth facts sufficient to establish a *prima facie* case for false imprisonment, and that the trial court did not err in granting a directed verdict on this cause of action.

## D. Malicious Harassment

Mr. Brown also claims that CBU engaged in malicious harassment in violation of the Tennessee Human Rights Act. The Tennessee Human Rights Act addresses discrimination based on race, creed, color, religion, sex, gender or national origin. Tenn. Code Ann. §4-21-101 *et seq*. The malicious harassment provision of the Act provides that "[a] person may be liable to the victim of malicious harassment for both special and general damages, including, but not limited to, damages for emotional distress, reasonable attorney's fees and costs, and punitive damages." Tenn. Code Ann. §4-21-701.

> The terms "malicious" and "harassment" are not defined in Tenn. Code Ann. § 4-21-701 or elsewhere in the Act. Although the respondents claim that the terms are plain in meaning, the definitions they suggest would result in an overly broad interpretation that would be inconsistent with the overall statutory scheme, the legislative history, and the legislative intent.
>
> The legislative history of Tenn. Code Ann. § 4-21-701 indicates that the supporters of the legislation favored creation of a civil remedy for so-called "hate crimes" committed by ethnic and racial supremecist groups such as the Ku Klux Klan, Aryan Nation and Skinheads. The civil remedy was to be in addition to, but separate from, the applicable criminal statutes set forth first in Tenn. Code Ann. § 39-17-313 and then in Tenn. Code Ann. § 39-17-309.

*Washington v. Robertson County*, 29 S.W.3d 466, 471 (Tenn. 2000). "To establish a claim for malicious harassment under Tennessee Code Annotated §4-21-701, the plaintiff must demonstrate that the perpetrator intentionally intimidated the plaintiff from freely exercising

a constitutional right." ***Davidson v. Bredesen***, 330 S.W.3d 876, 889 (Tenn. Ct. App. 2009).

> [A] claim of malicious harassment requires not only that a person acted maliciously, i.e., ill-will, hatred or spite, but also that a person unlawfully intimidated another from the free exercise or enjoyment of a constitutional right by injuring or threatening to injure or coercing another person or by damaging, destroying or defacing any real or personal property of another.

***Washington***, 29 S.W.3d at 473.

We have reviewed the entire record in this case and find no evidence that CBU's security officers "intentionally intimidated [Mr. Brown] from freely exercising a constitutional right." ***Davidson***, 330 S.W.3d at 889. Rather, as discussed above, the proof is that Mr. Brown was temporarily detained after officers developed probable cause to believe that he might pose a threat to campus security following Mr. Brown's attempt to evade the officers. From his brief, Mr. Brown appears to rely upon the fact that he is African-American to support his claim. The mere fact that Mr. Brown happens to be African-American, without more, is simply insufficient to show that the officers acted with malice or with an intent to intimidate Mr. Brown based on his race. Because of the lack of proof concerning any malicious intent on the part of the officers, Mr. Brown has failed to establish a *prima facie* case for malicious harassment. Therefore, we conclude that the trial court correctly directed a verdict in favor of CBU on this cause of action.

## E. Negligence Claims

### 1. Negligent Supervision, Hiring and Retention

> Tennessee courts recognize the negligence of an employer in the selection and retention of employees and independent contractors. *See, e.g.*, ***Marshalls of Nashville, Tenn., Inc. v. Harding Mall Associates, Ltd.***, 799 S.W.2d 239, 243 (Tenn. Ct. App.1990); ***Phipps v. Walker***, No. 03A01-9508-CV-00294, 1996 WL 155258, at *2 (Tenn. Ct. App. Apr. 4, 1996). A plaintiff in Tennessee may recover for negligent hiring, supervision or retention of an employee if he or she establishes, in addition to the elements of a negligence claim, that the employer had knowledge of the employee's unfitness for the job. *See* ***Phipps***, 1996 WL 155258, at *3.

***Doe v. Catholic Bishop for the Diocese of Memphis***, 306 S.W.3d 712, 714 (Tenn. Ct. App. 2008).

Mr. Brown's claims for negligent supervision, hiring and retention in this case are similar to the claims he made in the ***Brown v. Mapco*** case, where he also alleged negligent hiring, supervision, and retention of the Mapco clerk. In affirming the trial court's grant of summary judgment on this claim, the ***Brown v. Mapco*** Court reasoned:

> Assuming *arguendo* that Brown can establish the elements of a claim for negligence, Brown does not even allege acts to support his conclusory assertion that Mapco knew or should have known that Tyler was, allegedly, unfit for her job. He points only to the alleged fact that Tyler at times did not greet customers when they walked into the store and that she was terminated from an earlier job for dozing off while on duty. These facts are irrelevant in the context of this case. Brown's hyperbole and conclusory statements do not take the place of alleging actual facts to support his claim that Mapco "had knowledge of the employee's unfitness for the job."

***Brown v. Mapco***, 393 S.W.3d at 703 (quoting ***Doe***, 306 S.W.3d at 714). Likewise, in the instant case, Mr. Brown makes conclusory statements that the officers were unfit; however, there is no proof in the record to support his contention. However, even if we assume, *arguendo*, that CBU's employees were somehow unfit, there is no evidence in the record to support a conclusion that CBU knew or should have known that its employee(s) were unfit. Accordingly we cannot conclude that the trial court erred in granting a directed verdict on this claim.

## 2. Negligent Failure to Affirm Identity

Our research has not revealed a cause of action in Tennessee for negligent failure to affirm identity, nor has the Appellant cited any case law to support such a cause of action. Regardless, even if we assume that there is a valid cause of action for negligent failure to affirm identity, this cause of action would necessarily hinge upon the question of whether the security officers followed their training (if any) concerning proper identification of persons coming onto the CBU campus. There is simply no evidence in this record concerning the type of training that the officers received. Accordingly, there is no basis in the record to support a conclusion that CBU deviated from its training requirements, or that the officers acted outside the scope of their training when they allegedly failed to affirm Mr. Brown's identity. Accordingly, the trial court did not err in granting a directed verdict on this cause

of action.

## F. Negligence

Mr. Brown also appeals the trial court's dismissal of his general negligence claim. The prima facie elements of negligence are as follows:

> In order to establish a prima facie claim of negligence, basically defined as the failure to exercise reasonable care, a plaintiff must establish the following essential elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal cause."

*Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (quoting *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995)). In his brief, Mr. Brown supports his negligence claim with various facts surrounding the two incidents on the CBU campus, without any argument as to how these facts establish the prima facie elements of his negligence claim. After carefully reviewing Mr. Brown's brief, as well as the totality of the evidence in the record, we must conclude that Mr. Brown failed to submit any evidence from which a reasonable juror could conclude that CBU's conduct fell below the applicable standard, that Mr. Brown suffered an injury or loss, or that such alleged injury was the result of any breach of duty by CBU. Accordingly, the trial court did not err in granting a directed verdict on this claim.

## G. Assault and Battery

Assault and battery is an intentional tort under Tennessee law. "A battery necessarily requires an unpermitted touching of the plaintiff by the defendant or by some object set in motion by the defendant." *Cary v. Arrowsmith*, 777 S.W.2d 8, 21 (Tenn. Ct. App. 1989). However, under Tennessee law, not every physical contact that is unconsented to is so offensive that it amounts to a battery. In one case involving battery and other intentional torts, this Court observed that "[o]ffensive contact is contact that infringes on a reasonable sense of personal dignity ordinarily respected in a civil society." *Doe v. Mama Taori's Premium Pizza*, No. M1998-00992-COA-R9-CV, 2001 WL 327906 at *4 (Tenn. Ct. App. April 5, 2001) (no Tenn. R. App. P. 11 application filed). The question then is whether the CBU security guards infringed on Mr. Brown's reasonable sense of personal dignity when they detained him.

We find the doctrine of police privilege instructive on this issue:

> A police officer is not liable for assault and battery in connection with a use of force he or she is statutorily authorized to employ. The use of reasonable force to effectuate an arrest defeats a battery or an assault claim. In other words, contact incident to an arrest cannot form the basis of a claim for battery. Indeed, officers are privileged to commit a battery pursuant to a lawful arrest, subject to the excessive force limitation.

6A C.J.S. Assault § 35 (footnotes omitted). There is no dispute, however, that the campus security guards alleged to have assaulted Mr. Brown are not police officers, but are private individuals employed by a private university. The police privilege, however, extends to private individuals, if the alleged assault or battery occurred "in the same circumstances" as would contact with a police officer: "Private persons may arrest others under the same circumstances as officers may without incurring liability for assault [or battery]." 6A C.J.S. Assault § 35. The most common example occurs when private security in a casino forcibly removes a patron from the casino. *See* 6A C.J.S. Assault § 35. The doctrine has been further extended to private businesses reasonably believing that individuals have committed a theft. Indeed, this privilege is so prevalent that it has its own name, the shopkeeper's privilege. *See generally* 6 Am. Jur. 2d Assault and Battery § 96 ("A store security guard who detains a customer on suspicion of shoplifting is legally authorized to do so, and is not liable for battery . . . .").

Having concluded above that the CBU security officers had probable cause to question and detain Mr. Brown under the circumstances of this case, we also conclude that the evidence shows that the contact the officers had with Mr. Brown, i.e., handcuffing him and detaining him, were done in furtherance of the legitimate law-enforcement-type purpose of making certain that he posed no security threat. Certainly, detaining an individual in order to determine if there are outstanding warrants for his arrest is contact made "under the same circumstances" as a true police officer. In addition, there is nothing in the record to suggest that the security guards used unreasonable force in detaining Mr. Brown or that they detained him longer than was necessary to perform their duty to ensure that the CBU campus was safe for students and staff. In light of Mr. Brown's previous entry onto the CBU campus with an invalid identification card and his subsequent decision to evade the officers, reasonable minds could not differ that the officers actions in detaining him for questioning was reasonably related to the officers' official duties, and was done in such a manner as not to "infringe[] on a reasonable sense of personal dignity ordinarily respected in a civil society." ***Doe***, 2001 WL 327906 at *4. Accordingly, Mr. Brown failed to make out a *prima facie* case for the intentional tort of assault and battery. Therefore, we conclude that the trial court did not err in granting a directed verdict on this cause of action.

## H.  Civil Conspiracy

A civil conspiracy is a "combination between two or more persons to accomplish by concert an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means." ***Brown v. Birman Managed Care, Inc.***, 42 S.W.3d 62, 67 (Tenn.2001) (quoting ***Chenault v. Walker***, 36 S.W.3d 45, 52 (Tenn.2001)). "No liability can arise under a theory of civil conspiracy unless the underlying conduct that the conspiracy is directed towards is itself wrongful." ***Levy v. Franks***, 159 S.W.3d 66, 82 (Tenn. Ct. App. 2004). The simple act of conspiracy "does not furnish a substantive ground of action." ***Levy***, 159 S.W.3d at 82 (quoting ***Tenn. Publishing Co. v. Fitzhugh***, 165 Tenn. 1, 52 S.W.2d 157, 158 (1932)). In this case, if an underlying substantive claim fails-such as assault-then a claim of conspiracy to commit assault must also fail.  Having determined that Mr. Brown has failed to prove a *prima facie* case for any of the causes of action in this case, there can be no finding of conspiracy to commit these torts.  Accordingly, the trial court did not err in granting a directed verdict on the civil conspiracy claim.

## V.  Conclusion

For the foregoing reasons, we affirm the order of the trial court, granting a directed verdict in favor of Appellee, and dismissing all of Appellant's causes of action.  The case is remanded for such further proceedings as may be necessary and are consistent with this Opinion.  Costs of the appeal are assessed against the Appellant, Kim Brown, and his surety.

_____
J. STEVEN STAFFORD, JUDGE