FILED
08/16/2017
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2017 Session

## LATISIA UPSHAW v. SUNRISE COMMUNITY OF TENNESSEE, INC.

Appeal from the Circuit Court for Knox County
No. 3-491-11 Deborah C. Stevens, Judge

_____

### No. E2016-01005-COA-R3-CV

_____

This appeal concerns a claim of retaliatory discharge. After a trial before a jury, judgment was entered against the defendant employer. The plaintiff was awarded $225,000 in compensatory damages and $200,000 in punitive damages. The employer appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which Charles D. Susano, Jr., and Thomas R. Frierson, II, JJ., joined.

Tonya Kennedy Cammon, Chattanooga, Tennessee, for the appellant, Sunrise Community of Tennessee, Inc.

J. Myers Morton, Knoxville, Tennessee, for the appellee, Latisia Upshaw.

## OPINION

### I. BACKGROUND

In Tennessee, services to persons with developmental disabilities are administered by the Tennessee Department of Developmental Disabilities ("DIDD"). Sunrise Community of Tennessee, Inc. ("Sunrise") is an organization paid by the State to provide medical care and services to serve such individuals for the duration of their lives. An employee at Sunrise testified that

[s]upported living is the term that involves folks who live in

their own homes in the community. [Sunrise] provide[s] staffing to them around the clock. The staff is there to help them to learn skills to be as independent as they possible can be but also to provide support to them for things that they can't do on their own. So the staff is there to help them with personal hygiene, grooming, and dress. Preparing meals in their home. They provide transportation for them to medical appointments, go out in the community, to go visit with family and friends, to go to church, to be involved in community activities of their choosing.

The plaintiff in this case, Latisia Upshaw, began working for Sunrise as an office worker in 2008. At some point, Upshaw began providing in-home Licensed Practical Nurse ("LPN") care to Sunrise's client, H.G. Upshaw typically worked 16 hour shifts on Saturday and Sunday.

H.G.'s many medical problems included gastroesophageal reflux disease ("GERD"), a history of a gastrointestinal ("GI") bleed, difficulty swallowing (dysphagia), and chronic obstructive pulmonary disease ("COPD"). She was on continuous oxygen and tube feedings. A hospice patient, H.G. was limited to occasional "pleasure feedings" of 2 teaspoons of thin liquids with each meal. Because overfeeding of H.G. could lead to the development of aspiration pneumonia, standing doctor's orders provided that H.G. was to be taken immediately for x-rays and lab work if she presented with symptoms of that condition.

Throughout each shift, Sunrise's nurses were required to document the activities and medical events of patients. During an assessment, a nurse first checks the nurses' notes, summary sheets, records and logs from previous shifts in order to understand the patient's condition. According to Upshaw, upon starting her shifts, she began noticing that H.G. was exhibiting symptoms of lung congestion, wheezing, fever, and strong smelling urine. She was also vomiting thick green and yellow phlegm. According to Upshaw, these are signs of overfeeding. Additionally, Upshaw claimed to notice discrepancies regarding feeding in the nursing records from the previous nursing shifts. One summary sheet reflected H.G. being fed 2 tablespoons of pleasure foods instead of 2 teaspoons. According to Upshaw, on June 21, 2010, LPN Marie Ford documented at the end of her shift that H.G. "did not eat . . . ."; however, the oncoming nurse wrote that when she arrived for her shift, H.G. was seated at the dining room table eating food prepared by the day nurse, i.e., Ford. Another feeding record denoted "5tp of potato salad." Upshaw also contends that she observed H.G. projectile vomiting *chunks* of non-pureed food. Additionally, H.G. informed Upshaw that Ford was overfeeding her. Upshaw recalled that H.G. would argue with her about wanting more food and would sometimes say, "Marie gives me more." Upshaw concluded that Ford was documenting that she was providing H.G. with the proper amount of food, but she was actually giving

her more.

According to Upshaw, she reported her thoughts regarding H.G.'s overfeeding in writing with Sunrise, as the Sunrise Employee Handbook required nurses to report suspected incidents of neglect to Sunrise in order that the employer could "conduct its own investigation . . . ." Upshaw recalled that Sunrise's nurses were specifically and repeatedly instructed to report neglect internally up a chain of command. Thus, according to Upshaw, she began at the end of 2009 and continued up until September 2010 to report H.G.'s overfeeding to a number of staff at Sunrise, including her supervisor, her supervisor's supervisor, incident management, and Sunrise's compliance officer. Upshaw claims that she even questioned a State employee about how she could file a grievance to stop H.G.'s overfeeding. Instead of taking action, however, Upshaw's supervisor and director of nursing, Cathie Cardwell ("the DON") told her that the nurse involved, Ford, "was thinking with her heart . . . ."

## Retaliation

### Photographs and Purchases

According to Upshaw, after she reported H.G.'s overfeeding, Ford and others began to retaliate against her. On May 12, 2010, four months prior to H.G.'s hospitalizations, Sunrise gave Upshaw a "Disciplinary Warning Notice & Action Taken" for two "violations" of company policy: "Photographing individual without written consent & Purchasing gifts (clothes) for individual against company policy."

The violations arose from H.G.'s request to have her hair colored. H.G.'s sister (her conservator) and the DON each agreed to allow the coloring of H.G.'s hair. Once H.G.'s makeover occurred, including make up and a new outfit,[1] the sister arrived for a party on February 17, 2010. The sister requested pictures of H.G. with the Sunrise staff. Because Upshaw had taken some of the pictures at the request of the sister, she was cited for violating corporate policy[2] and received a formal write up for this incident on May 12, 2010.[3]

---

[1] According to Upshaw, H.G. used her money to purchase the outfit.

[2] Some Sunrise officials internally questioned whether it was appropriate to reprimand Upshaw for photographing H.G. without consent because the sister had asked her to take the pictures ("seems like they were giving her a hard time . . . why wouldn't the DON use some common sense in this regard?"). In fact, Sunrise's Human Resources Director opined in an email that these were inappropriate reasons for taking disciplinary actions or for terminating Upshaw. Copies of the photographs were paid for by H.G.

[3] According to Upshaw, H.G. enjoyed going out with her on Saturdays to shop. Upshaw contends that other Sunrise workers began making sure that all H.G.'s money for the week was spent before Upshaw's Saturday shift so that H.G. would act out toward Upshaw when she could not go shopping.

## License Renewal

Another write up was received when Upshaw allowed her nursing license to lapse.[4] Upshaw's LPN license, which required renewal every two years on her birthday, expired on April 30, 2010. Upshaw asserts that weeks prior to that date, on March 15, 2010, she had scheduled vacation time for the weekend of her birthday. While she was off, a flood struck Nashville and she was unable to renew her license before her next shift the following weekend. According to Upshaw, if the flood had not occurred, her license would have been renewed within 24 hours before she had to return to work again. However, after she was unable to quickly renew her license, Upshaw took two additional vacation days until the renewed license was received. Sunrise notes that the lapse of the nursing license, on its own, was grounds for immediate termination of Upshaw's employment.

Upshaw claims that Sunrise provided reminders for license renewals to employees, but she was not provided with one. Indeed, Sunrise employee Ann Williams admitted that she had "talked with several" nurses and they "indicated that . . . a reminder notice [was sent] to them in the mail." The trial court observed that Sunrise did not dispute that the employer regularly placed notifications in the monthly newsletter of renewal dates for licenses and certificates but claimed that there was no policy requiring them to do so.

## H.G.'s Hospitalization

On September 4, 2010, Upshaw assessed H.G. and determined that she was exhibiting symptoms of crackling sounds in her lungs, wheezing, decreased oxygen saturation, and vomiting. As directed by the standing orders, Upshaw took H.G. to outpatient services to have x-rays and lab work completed. According to Upshaw, she advised her supervisor at that time that H.G. was being overfed and that she was taking the client for tests. As they were leaving outpatient services, H.G. began projectile vomiting large chunks of food from her mouth and her nose. In response, Upshaw took H.G. immediately to the emergency room, where she was admitted to the hospital with pneumonia. Upshaw informed the emergency room doctor that, in her opinion, H.G. had been overfed non-pureed food.

Prior to Upshaw's next nursing shift the following Saturday, H.G. had been released from the hospital back to the nursing care of Sunrise. During Upshaw's shift, on

---

[4]The "Disciplinary Warning" of record denotes as follows: "Reminded multiple times by Supervisor & Director of Professional Development prior to expiration. Expired on 4/30/10. Result of expiration caused other staff to cover 32 hrs. resulting in overtime and hardship on other staff." Upshaw contends that she was not "[r]eminded multiple times."

September 11, 2010, H.G. again projectile vomited chunks of food and was admitted to the hospital with double aspiration pneumonia. Upshaw told the same emergency room doctor that the same person was continuing to overfeed H.G. and that nothing was being done by the employer to stop it. When H.G. was again released from the hospital back to the same nurse Upshaw believed was engaging in the overfeeding, Upshaw called the State hotline to report Sunrise's failure to stop the alleged neglect. According to Upshaw, a little over a month later, on October 21, 2010, Sunrise informed her that she was being fired because she had lied to the emergency room doctor about the overfeeding.

## DIDD Investigator

A DIDD investigator investigated Upshaw's complaint of neglect, requiring Sunrise to provide documents reflecting H.G.'s medical care. The DIDD investigator's file consisted of 281 pages. The first 12 pages of the file are the investigator's final report, issued on September 29, 2010. The report describes the investigation and summarizes all the evidence upon which the investigator relied in making his decision about whether H.G. was neglected. The DIDD investigator found that he could not determine definitively that H.G. was being overfed; thus, he could not conclude that there had been neglect. A physician where H.G. was treated informed the investigator that there was no medical way to determine for certain if anyone had overfed H.G. because she could easily aspirate on the fluid that she was receiving through the G Tube. The investigator's report did cite Sunrise for late reporting because the alleged problem was "discovered by agency staff on 09-04-10 and not reported to agency management or Regional Investigators until 09-15-10." Sunrise attributed the "late reporting" to Upshaw. Sunrise's Williams later testified at trial that "the final thing that caused the decision to terminate Ms. Upshaw was the late reporting to the State. But that was taken into consideration when reviewing her personnel file, the cumulative disciplinary actions that she had on file." Upshaw claims that reasons given by Williams became the justification for discharging her after and in retaliation for her reporting the overfeeding to the State.

The DIDD investigator related that the DON believed an entry concerning H.G. had been altered and that she had requested Upshaw to meet with her to discuss the matter. The DON informed the State as follows:

> "Please be advised that, in review of the nursing documentation, it is noted that a nurses entry was possibly altered on the Service Summary dated 9/3/10 (See attached). It appears that '2 tsp' was changed to a '5 tsp.' In review of the narrative summary it is documented as 2 tsp. Even though this was not Ms. Ford's entry, it was altered during the time that she normally works. She happened to be filling in that day and left at 3 p.m. I was prepared to address the above

concerns with Ms. Upshaw and had left her voice mails to return my call prior to her complaint with the State hotline. Please note, Ms. Upshaw has had two disciplinary warnings this year. One was for letting her license expire after multiple reminders from the DON to renew and the other for breaking company policy. This issue will be her 3rd disciplinary notice under my supervision and will result in termination. Prior to my employment with Sunrise, Ms. Upshaw also received a disciplinary notice f[ro]m the previous Director of Nursing for 'rudeness, belittling staff and self gratification . . . .'"

According to Sunrise, after being asked to report to the DON's office, Upshaw called the State DIDD investigator branch to file her complaint in order to claim whistleblower status. Sunrise asserts that when Upshaw realized that she was in trouble, she went to the State with "baseless accusations." The investigator testified that the alleged alteration made him "feel that note was unreliable." He understood that the DON was accusing Upshaw of altering the medical record of H.G. in an attempt to implicate Ford in wrongdoing and that she would be terminated because she already had two prior disciplinary actions.

According to Upshaw, during the State's investigation, Sunrise's purpose and desire was to wrongfully misrepresent the facts to DIDD by accusing Upshaw of falsifying a medical record and shifting blame to her for the late reporting of the alleged neglect. Sunrise led the State to believe that she had only reported the abuse and neglect for the first time when she called the hotline. To the contrary, Upshaw argues that she did timely report to "agency management," i.e., Sunrise, but Sunrise did not provide the documents to the state DIDD investigator and instead destroyed, removed, or withheld them. Upshaw contends that Sunrise did not share with the DIDD investigator the fact that Upshaw had been reporting about H.G.'s overfeeding because that would have revealed Sunrise's prior awareness of the issue. She argues that had the DIDD investigator known that she had previously reported the overfeeding to Sunrise "agency management," the investigator's conclusions would have been different. The investigator testified as follows:

> Q. Would it have made a difference in your investigation if there were records . . . that you found or were provided to you that Ms. Upshaw was telling Sunrise repeatedly that [H.G.] was being overfed?
> A. Yes, I think so.

Upshaw filed her complaint for retaliatory discharge pursuant to both the common law and the statutory provision, Tennessee Code Annotated section 50-1-304, on September 23, 2011. She alleged that Sunrise fired her in retaliation for filing a report of

alleged abuse or neglect of a Sunrise client to DIDD investigators.

In its answer to Upshaw's complaint, filed on October 20, 2011, Sunrise denied the allegations but included the following admission: "14. Sunrise admits that plaintiff made an allegation of overfeeding and feeding outside the guidelines of client orders to Cathie Cardwell, plaintiff's supervisor . . . ." However in Sunrise's amended answer, filed on October 14, 2015, the company denied that Upshaw made allegations of overfeeding and feeding outside the guidelines of client orders to Cardwell. In paragraph 18 of Sunrise's October 2011 answer, it admitted that Upshaw filed an internal complaint of H.G.'s overfeeding. However, in paragraph 18 of the October 2015 amended answer, Sunrise denied that Upshaw made an internal complaint of H.G.'s overfeeding. In paragraph 19 of both Sunrise's answer and amended answer, it admitted that Upshaw received disciplinary write-ups after Upshaw's internal complaints were made. In paragraph 21 of Sunrise's initial answer, it admitted that Upshaw made a complaint of H.G.'s overfeeding to Williams, the DON's supervisor, who referred Upshaw to Michelle Pitts, who was Williams' supervisor. In Sunrise's October 2015 amended answer, it denied that Upshaw made a complaint to Williams about her allegations of overfeeding. Sunrise also raised as defenses in the later answer that Upshaw was an at-will employee who had several prior disciplinary actions and was slated to be fired prior to her report of alleged abuse or neglect of H.G.

**Discovery**

During discovery, Upshaw requested specific records in which she personally documented the overfeeding of H.G. In April/May 2013, Sunrise produced 572 pages of documents. A year later, around May 28, 2014, Sunrise's attorney represented, among other things, "There are no documents in my client's possession which have not been produced. . . ." In March 2015, however, Sunrise represented that more records had been located, and, on April 13, 2015, the employer produced 864 new documents. Upon Upshaw filing a motion to compel discovery two days later, Sunrise produced 1,218 new documents the following week. On April 24, 2015, Sunrise responded to Upshaw's second production request and repeatedly stated that it had produced all responsive documents in its possession. On July 17, 2015, the trial court heard argument on the pending discovery motions, at which time Sunrise's attorneys informed the court that specific documents could not be found or were destroyed. However, within 29 days after the hearing, on August 14, 2015, Sunrise emailed supplemental responses and produced more than 5,000 new pages of documents. At that time, Sunrise repeated that "all relevant documents in Sunrise's possession, custody or control are attached or have already been produced. . . ." On August 25, 2015, a 30.02(6) Sunrise representative testified that no records or documents had been lost or destroyed.

The case was tried before a jury from October 12, 2015, to October 15, 2015. During the trial, Sunrise argued that Upshaw put on no evidence of misconduct outside of

her own self-serving testimony that she had reported the alleged overfeeding internally or that she was retaliated against for reporting. According to Sunrise, Upshaw could not produce any documentation that confirmed her version of the events because no such documents exist. Sunrise claimed that Upshaw never demonstrated specific gaps in the record. Upshaw responded that Sunrise had removed records, altered records, and that records were missing. She contended that Sunrise had failed to produce nurses' notes and summary sheets that revealed Upshaw was reporting the overfeeding of H.G. because those records would have been unfavorable to the employer.

Final judgment was entered against Sunrise on October 26, 2015. On October 15, 2015, the trial court granted a directed verdict in favor of Sunrise with regard to the statutory claim.[5] On the common law retaliatory discharge claim, the jury concluded that a preponderance of evidence supported the conclusion that Sunrise wrongfully discharged Upshaw and that the report of neglect was "a substantial factor in her discharge." The jury awarded Upshaw $150,000 in back pay, $65,000 in emotional distress, $10,000 in embarrassment/humiliation, and $200,000 in punitive damages. The total award was $425,000.

Post-trial, Sunrise asserted that the verdict of the jury revealed an improper motive to punish Sunrise for the allegations of discovery abuse. Sunrise argued that Upshaw "successfully confused the issues and guided the jury away from examination of the allegations *presented for investigation* to allegations made by [Upshaw] *after her termination by Sunrise*. Rather than presenting admissible evidence, Upshaw instead made allegations that Sunrise was hiding documents, destroyed records, or altered records. The trial court observed in October 2015: "I can't look at this in any other way but to say that your folks [at Sunrise], for whatever reason, didn't do the job that the Rules of Civil Procedure require them to do in searching for the documents." In a post-trial order, the court observed that the

> trail of document production in this case was extremely problematic. For example, the Defendant testified that it produced all of the records the state asked for, but could not identify what documents had been made available to the state. Defendant argued that it kept no record of documents produced to the state and that the only source of knowing

---

[5]The question presented by a Rule 50 motion for a directed verdict is whether the plaintiff has presented sufficient evidence to create an issue of fact for the jury to decide. *Spann v. Abraham*, 36 S.W.3d 452, 462 (Tenn. Ct. App. 1999). For this court to review the sufficiency of the evidence on appeal, a motion for a directed verdict must have been made at the conclusion of all the proof and renewed in a post judgment motion following the jury's verdict. *Steele v. Columbia/HCA Health Care Corp.*, W2001-01692-COA-R3-CV, 2002 WL 1000181 at *3 (Tenn. Ct. App. May 13, 2002).

what had been produced to the state would be to obtain a copy of the state file. The Plaintiff asserted that numerous documents were not properly produced during discovery. Defendant provided no record of documents produced from which the court could evaluate what had been produced. On May 6, 2015, the Plaintiff filed a supplemental motion to compel discovery based upon a Request for Production initially filed in July of 2012. The motion to compel was heard at a lengthy hearing on July 17, 2015. At that hearing, the Defendant repeatedly stated that it had produced all the documents that it had but that there were some documents that were lost or destroyed as a result of a flood in a storage facility and some destroyed as part of a normal document retention policy. However, none of the Defendant's discovery responses addressed the status of documents that were not produced. Instead, the Defendant chose to attempt to limit the production response and ignored the question as to any lost or destroyed documents. . . .

On August 14, less than eight weeks before the scheduled trial, the Defendant sent the Plaintiff more than 5000 pages of electronic documents and 3000 pages of paper documents. On October 1, 2015, the Plaintiff filed a Request for Discovery sanctions . . . . As late as October 6, the parties were still engaged in a dispute as to a review of documents. The litigation in this matter had been pending for more than four years and many of the discovery responses at issue were outstanding for more than three years. This court found no evidence that counsel for the Defendant intentionally misled the Plaintiff or this court. Rather this court found that the Defendant violated Rule 26.07 of the Tennessee Rules of Civil Procedure. . . . The Defendant could not have made a serious effort to find the documents. A representation was made to the court that the person who had originally provided information to counsel was deceased and that the new person, found the documents immediately after learning the court's ruling. While it was appropriate for the Defendant to produce the documents, the production was not timely, and the original production could not have been based on a "reasonable inquiry." . . . Ms. Ann Williams was produced as a Rule 32.06 witness on this issue and testified that the Defendant has a ten (10) year document retention policy. When asked if any documents in this case were

- 9 -

destroyed by water and she testified that she was unaware of any records being destroyed. It was inconceivable to the court that for three years, the Defendant was unable to determine the location of the requested documents assuming, as required, a reasonable inquiry was made.

Sunrise timely filed a motion for judgment notwithstanding the verdict, pursuant to Rule 50.02 of the Tennessee Rules of Civil Procedure, or for a new trial. In its order denying the motion, the trial court found that there was "ample evidence" for the jury to assess the credibility of the defendant's witnesses and to "conclude that the alleged prior incidents of disciplinary action were inappropriate and perhaps, in response to [Upshaw's] complaints of overfeeding." The court observed that the jury "heard the evidence of the timeline of the reports, the nature of the reports, and the alleged reasons asserted by the Defendant for the termination of the Plaintiff." The court noted that the jury "could have judged the 'severity' of the offense as described by the Defendant at trial versus the actions of the Defendant, at the time," such as in "giving the Plaintiff paid vacation days and allowing her an opportunity to renew her license after the state offices reopened after the flooding." The trial court commented that the jury "could also have believed that the disciplinary action for taking a picture of a client at the request of the client's sister on the sister's phone was retaliatory, particularly in light of the internal documentation questioning the supervisor's wisdom in issuing the disciplinary action." The trial court observed that it was clearly relevant to the jury that the Plaintiff asserted making four claims about overfeeding to the Defendant and the Defendant denied knowledge of those complaints.[6] The court determined that there was evidence from which the jury could conclude that Upshaw had a good faith belief that someone was disregarding medical orders as to restrictions on feeding that could be characterized as abuse or neglect—a violation of public policy—and that the reasons given by Sunrise for discharging Upshaw were pretextual and not the true reason she was fired. Accordingly, after reviewing all the evidence in the light most favorable to Upshaw, the trial court found that material credible evidence supports the verdict and that reasonable minds could differ as to the conclusions to be drawn from the evidence. Sunrise has timely appealed the judgment.

## II. ISSUES

The issues raised on appeal are stated as follows:

1. Whether, as a matter of law, the trial court erred in finding Upshaw was a "whistleblower," as that term has been defined

---

[6] Upshaw represented that she made four complaints of overfeeding to Sunrise. The employer produced one complaint in 2013. On August 28, 2015, six weeks before trial, Sunrise produced the other three reports.

by the Tennessee Supreme Court, in the case *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34 (Tenn. 2015).

2.    Whether, as a matter of law, the trial court erred in denying Sunrise's motion for directed verdict and/or motion for judgment notwithstanding the verdict.

3.    Whether the trial court erred in allowing the jury to consider the issue of punitive damages.

## III.  STANDARD OF REVIEW

This case was heard before a jury.  Findings of fact by a jury in a civil action where the jury's verdict has been approved by the trial judge may be set aside only if there is no material evidence to support the verdict. *Whaley v. Perkins*, 197 S.W.3d 665 (Tenn. 2006).  In reviewing a judgment based upon a jury verdict, an appellate court is not at liberty to weigh the evidence or to decide where the preponderance lies.  In determining whether there is material evidence to support the verdict, the appellate court shall (1) take the strongest legitimate view of all the evidence in favor of the verdict, (2) assume the truth of all that tends to support it, (3) allow all reasonable inferences to sustain the verdict, and (4) discard all to the contrary.  *Akers v. Prime Succession of Tennessee, Inc.*, 387 S.W.3d 495 (Tenn. 2012). The credibility of witnesses is the province of the jury, not appellate courts.  *Goree v. United Parcel Service, Inc.*, 490 S.W.3d 413, 443 (Tenn. Ct. App. 2015).

An appeal from the denial of a directed verdict involves a question of law concerning whether the evidence is sufficient to create an issue for the jury to decide. *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 49 (Tenn. Ct. App. 2013).  Directed verdicts under Rule 50.01 of the Tennessee Rules of Civil Procedure and judgments notwithstanding the verdict under Rule 50.02 of the Tennessee Rules of Civil Procedure are reviewed using the same standard of review. *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977).  They are appropriate only when reasonable minds cannot differ as to the conclusion to be drawn from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000). A case should not be taken away from the jury, even when the facts are undisputed, if reasonable persons could draw different conclusions from the facts.  *See Gulf, M. & O. R. Co. v. Underwood*, 187 S.W.2d 777, 779 (Tenn. 1945).  The evidence is reviewed in the light most favorable to the motion's opponent, giving the motion's opponent the benefit of all reasonable inferences, and disregarding all evidence contrary to that party's position. *Alexander*, 24 S.W.3d at 271.

## IV.  DISCUSSION

### A.

A common law cause of action for retaliatory discharge was first recognized by the Tennessee Supreme Court in *Clanton v. Cain – Sloan Co.*, 677 S.W.2d 441, 442 (Tenn. 1984).  To establish a retaliatory discharge claim under the common law, Upshaw had the burden of proving the following four elements:

> (1) she was an at-will employee of Sunrise;
>
> (2) the defendant employer discharged or terminated Upshaw's employment;
>
> (3) the reason for the discharge was that Upshaw attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and
>
> (4) A substantial factor in Sunrise's decision to discharge Upshaw was her exercise of protected rights or compliance with clear public policy.[7]

*Webb v. Nashville Area Habitat for Humanity*, 346 S.W.3d 422, 437-38 (Tenn. 2011). To prevail in a common law whistleblower action, a plaintiff must demonstrate that his or her exercise of protected rights or report of illegal activity served a public purpose rather than a private one and was a substantial factor in the employer's decision to discharge the employee.  *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 788 (Tenn. 2010); *Guy v. Mut. of Omaha Ins.* Co., 79 S.W.3d 528, 535, 538 n. 4 (Tenn. 2002).  Such proof imposes upon the employer the burden of showing a legitimate, non-pretextual reason for the employee's discharge." *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993).  No dispute exists that Sunrise and Upshaw had an employment-at-will relationship and that Sunrise terminated Upshaw's employment.

An employee asserting a whistleblower claim may report illegal activity internally but must report to someone other than the person responsible for the activity.  *See Coleman v. Humane Soc'y of Memphis*, No. W2012-02687-COA-R9-CV, 2014 WL 587010, at *24-26 (Tenn. Ct. App. Feb. 14, 2014).  "So long as employees' actions are

---

[7]The primary difference in the statutory version is that it requires an employee to show that his or her activity was the sole reason for the discharge, whereas the common law form requires an employee to show that his or her activity was a substantial factor in the termination.

not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged." *Guy*, 79 S.W.3d at 537 n. 4 (quoting *Wagner v. City of Globe*, 722 P. 2d 250, 257 (Ariz. 1986)).

Sunrise asserts that Upshaw was not a whistleblower because, first, there was no proof of overfeeding and, second, Upshaw did not act in good faith when she filed a false report. According to Sunrise, making baseless accusations is not a protected activity. Sunrise argues that making baseless accusations is not a protected activity under Tennessee law. *Mason v. Seaton*, 942 S.W.2d 470, 472 (Tenn. 1997). Sunrise claims that Upshaw made the report to the state in order to attain "whistleblower" status and that such false reporting would exclude a "good faith" belief. Sunrise additionally contends that even if Upshaw had a good faith belief that the employer had engaged in improper or illicit activity, she did not effectively "blow the whistle" or meet the reporting requirement. According to Sunrise, Upshaw failed to "blow the whistle" in an effective way that would immediately stop what she termed illegal activity. In *Formac Stables*, the Court stated that "whistleblower status requires 'reporting [illicit activity] to someone higher than the wrongdoer either inside the company, if available, or outside the company, when internal channels are unavailing." 463 S.W.3d at 39. By Upshaw's own admission, she knew that the internal reporting had been ineffective. When the "internal channels" were unavailing, and Sunrise had done nothing to stop the "illicit activity," by this point, *Formac Stables* required Upshaw to immediately report to an outside authority, the State DIDD. Sunrise notes that Upshaw did not report the neglect timely, instead waiting eleven days. This failure to timely report to the State, according to Sunrise, removes Upshaw from protected status as a "whistleblower" and makes her simply an employee-at-will, subject to discharge. Sunrise asserts that if H.G. was being overfed and was really in danger, then Upshaw's report eleven days after the fact did nothing to further any public policy. According to Sunrise, an employee has no cause of action as a whistleblower unless the employee shows that the reporting furthered some clear public interest. *Id.*

"[M]anagement has the right to terminate an employee over management and policy decisions, so long as the employer does not violate any clearly established public policy in doing so." *Chism v. Mid-South Milling Co.*, 762 S.W.2d 552, 556 (Tenn. 1988). Whistleblowing claims are not triggered "by simple disputes or arguments between employees and their supervisors regarding work place procedures" *Collins v. AmSouth Bank*, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007). Sunrise asserts that Upshaw was not terminated for making the report to the state DIDD. Rather, she was terminated for failing to report in a timely manner and because of her previous disciplinary warnings. Sunrise argues that when there have been actual violations of rules, an at-will employee may be terminated. *See Williams v. Burns*, 465 S.W.3d 96, 117 n. 24 (Tenn. 2015) (quoting *Fleming v. Correctional Healthcare Solutions, Inc.*, 751 A. 2d 1035, 1040 (N.J. 2000)). Sunrise asserts that waiting eleven days before reporting alleged abuse or neglect to an outside authority is unreasonable and a violation of the Sunrise Code of Conduct

and public policy.

Upshaw represented that she made four complaints of overfeeding to Sunrise. According to Upshaw, the evidence of overfeeding (i.e., neglect) included, among other things, that she observed large chunks of food in H.G.'s vomit and that H.G. told her that Ford was overfeeding her. As noted by the trial court, in this case, Upshaw reported to her supervisor that a nurse from a prior shift was overfeeding H.G. The second time it occurred, when Upshaw did not believe that action was properly being taken, she reported to the supervisor's supervisor and a regional director. The third time the overfeeding occurred, she reported her concerns internally and to the state. The trial court determined that there was sufficient evidence to find that Upshaw reported to someone higher up in the company and not the actual wrongdoer, and she ultimately reported to the State when the internal channels were unsuccessful. The jury had the opportunity to evaluate the evidence both as to the manner of communication and the timeliness and rendered a verdict in favor of Upshaw.

Upshaw notes that Sunrise incompletely referenced opinions from physicians and the DIDD investigator's findings to claim that H.G. was not being overfed. She observes that the physicians actually opined that there was medically no way to determine definitively whether H.G. was being overfed and that is what the DIDD investigator concluded. That being said, Upshaw asserts that her claims of overfeeding were never medically refuted. The jury apparently found that Upshaw had a good faith belief that Sunrise had neglected H.G.

The trial court concluded:

> [T]here was sufficient evidence in the record, including the Plaintiff's testimony of her observations of projectile vomiting of solid food from which the jury could conclude that the Plaintiff believed that someone was violating the standing orders of a physician regarding pleasure feeding. Plaintiff testified that on Saturday, September 4, she did an assessment of the H.G. and found that H.G. was not doing well. The client was taken to the hospital and the Plaintiff testified that she reported her observations to the on-call supervisor. She also testified that she reported her concerns to the emergency room doctor. The jury heard the evidence of the timeline of the reports, the nature of the report and the alleged reasons asserted by the Defendant for the termination of the Plaintiff including the cumulative effect of multiple write-ups to the state. The Defendant asserts that the report to the state was not a substantial factor in the termination but rather the late reporting and prior disciplinary actions that

- 14 -

resulted in the termination. There is sufficient evidence within the record from which the jury could conclude that the report by Upshaw furthered a clear public policy of reporting overfeeding of a client in direct violation of medical order and that the report was timely and the Defendant's reasons for termination were not valid.

We hold that the evidence in the record as a whole preponderates in favor of a finding that Upshaw was a whistleblower pursuant to the common law definition.

## B.

Sunrise argues that the trial court erred in not granting its motion for a directed verdict and/or motion notwithstanding the verdict. When an employer moves for a directed verdict, the employee has had the opportunity to present his or her case in full. *Gossett*, 320 S.W.3d at 786. *Holmes v. Wilson*, 551 S.W.2d 682, 685 (Tenn. 1977) requires the trial court to take the strongest legitimate view of the evidence in favor of the plaintiff and to discard all the countervailing evidence. A judgment notwithstanding the verdict is appropriate only when reasonable minds cannot differ as to the conclusions to be drawn from the evidence. *Johnson v. Tenn. Farmers Mut. Ins. Co.*, 205 S.W.3d 365, 370 (Tenn. 2006). If material evidence is in dispute or doubt exists as to the conclusions to be drawn, a motion for a judgment notwithstanding the verdict is properly denied. *Id.*

The trial court found as follows:

> The jury was able to hear and observe the testimony of numerous witnesses on the issue of whether Plaintiff had a good faith belief of overfeeding. She testified that on numerous occasions she personally observed projectile vomiting of the client of solid food which would be in direct violation of medical orders. She testified that she reported overfeeding to her supervisors on several occasions and documented the overfeeding specifically in a nursing note of September 4, 2010 after the hospitalization of the client. The Defendant argues that the Plaintiff wrongfully accused Nurse Ford of the overfeeding on September 3 and then created "self-serving" notes. The jury had the opportunity to hear all of the evidence from the Plaintiff and the proof of the Defendant which included numerous supervisors and the testimony of the state investigator. There were inconsistencies in the testimony of the defense witnesses and the jury was in a position to judge the credibility of the

witnesses. There was evidence from which the jury would conclude that the Plaintiff had a good faith belief that someone was disregarding medical orders as to restrictions on feeding that could be characterized as abuse or neglect.

In another portion of an order, the trial court observed:

Defendant asserts that the Plaintiff put on no independent evidence of overfeeding other than the testimony of the Plaintiff. However, the jury had the opportunity to see and hear the testimony of the Plaintiff and clearly deemed her testimony to be credible as to her observations of projectile vomiting and the discomfort caused to the client. The Defendant did not dispute that the Plaintiff's standing medical orders limited her to 2 teaspoons of pureed food and did not provide any explanation of Plaintiff's observation of projectile vomiting of solid food. Defendant describes these statements as self-serving but in fact, the jury was charged with the obligation of evaluating the credibility of the Plaintiff's testimony and clearly found the testimony to be credible. . . .

Taking "the strongest legitimate view" of the evidence in favor of Upshaw, "allowing all reasonable inferences" in her favor, and "discarding all countervailing evidence," we find that the trial court properly denied the motion. In the instant case, there is no question but that the issues presented a jury question. Because reasonable minds could differ as to whether Sunrise retaliatory discharged Upshaw, we find that this question was properly decided by the jury and it is not our purview to reconsider that determination. We, therefore, affirm the trial court's decision denying Sunrise's motion for judgment notwithstanding the verdict.

### C. Punitive Damages

Sunrise argues that the trial court erred in ruling that the issue of punitive damages should be presented to the jury.

Punitive damages are intended to "punish a defendant, to deter him from committing acts of a similar nature, and to make a public example of him." *Huckeby v. Spangler*, 563 S.W.2d 555, 558-59 (Tenn. 1978). To qualify for punitive damages, Upshaw was required to show the jury clear and convincing evidence that Sunrise acted either intentionally, fraudulently, maliciously, or recklessly. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Further, "a plaintiff must prove the defendant's

intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence." *Id.* "Clear and convincing evidence" refers to "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Id.* at 901 n. 3. Punitive damage awards are reserved for cases involving serious and egregious wrongs. *Goff v. Elmo Greer & Sons Constr. Co.*, 297 S.W.3d 175 (Tenn. 2009).

The jury had evidence before it that Upshaw had personally reported the overfeeding of H.G. to everyone at Sunrise in writing and orally. When Upshaw's supervisor told Upshaw that Ford "thinks with her heart" and did nothing to address Upshaw's claims, Upshaw followed Sunrise's chain of command to complain. Sunrise disregarded Upshaw's written and oral reports. Further, the employer's later failure to produce the documents until very late in discovery was relevant evidence "from which the jury could conclude that the defendant's conduct was egregious." Likewise, consideration of Sunrise's efforts to conceal Upshaw's internal reporting of H.G.'s overfeeding from the DIDD investigator and during discovery in these proceedings is consistent with the purposes of punitive damages. *Metcalfe v. Waters*, 970 S.W.2d 448, 452 (Tenn. 1998).

The jury further saw the inconsistencies in Sunrise's story. Sunrise admitted the reporting in paragraph 14 of its answer, then denied the reporting in paragraph 14 of its amended answer. Sunrise admitted Upshaw's internal complaint was filed in paragraph 18 of its answer, then denied Upshaw's internal complaint was filed in paragraph 18 of its amended answer. Sunrise admitted Upshaw received a disciplinary write-up after she made internal complaints of overfeeding in paragraph 19 of its answer, then denied the same in paragraph 19 of its amended answer. Sunrise admitted that Upshaw made a complaint to Ann Williams about overfeeding in paragraph 21 of its answer, then denied the same in paragraph 21 of its amended answer. Viewing the circumstances as a whole, we find the record contains material evidence supporting the jury's finding by clear and convincing evidence that Sunrise acted intentionally and that punitive damages were proper.

## V. CONCLUSION

We affirm the verdict of the jury and the judgment of the trial court in all respects. The cause is remanded to the trial court for further proceedings. Costs of the appeal are assessed to Sunrise Community of Tennessee.

_____
JOHN W. MCCLARTY, JUDGE