IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 7, 2021 Session

**KENDRA C. KILLIAN v. AUBREY D. MOORE**

**Appeal from the Circuit Court for Wilson County**
**No. 2017-CV-564       Clara W. Byrd, Judge**

**No. M2020-01283-COA-R3-CV**

In this post-divorce proceeding, a father sought to modify a parenting plan to increase his parenting time and reduce his child support obligation. He later sought to be designated as primary residential parent for the parties' daughter due to threats made by the mother's then-husband. The father was designated as such on a temporary basis, and the mother filed numerous motions seeking to be restored as the primary residential parent. After a trial, the court named Father primary residential parent, finding that a material change in circumstances had occurred and that the change was in the best interest of the child. The trial court entered a new parenting plan and set Mother's support obligation. The mother appeals the designation and raises many other issues. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which JOHN W. MCCLARTY and W. NEAL MCBRAYER, JJ., joined.

Kendra C. Killian, Mt. Juliet, Tennessee, pro se.

Aubrey D. Moore, Woodbury, Tennessee, pro se.

**OPINION**

Aubrey Moore ("Father") and Kendra Killian ("Mother") are the parents of one daughter, born in January 2009. They were divorced by the Davidson County Circuit Court in October 2011. The final decree of divorce incorporated an agreed parenting plan that named Mother as primary residential parent and awarded Father zero days of parenting time, with "visitation as agreed upon by the parties and as [Father's] work schedule allows." More than once since their divorce, Father has sought modification of the visitation provisions of the parenting plan. His initial petition was dismissed for lack of

prosecution. While his second petition for more parenting time and a reduction in child support was pending, Mother moved to Wilson County, so the matter was transferred to the Circuit Court of Wilson County. No order resolving this petition appears in the record, but pertinent to this appeal, Father filed a petition in October 2017 in the Circuit Court for Wilson County seeking the same outcome, i.e., an increase in parenting time and a reduction in child support. Specifically, the petition sought to have the parenting plan modified so that he received equal parenting time and his child support obligation was reduced accordingly. Against a backdrop of numerous motions filed by both parties pertaining to child support and visitation, the trial court gradually increased Father's visitation and reduced his child support obligation. Both Mother and Father remarried, but their relationship remained antagonistic. A guardian ad litem was appointed.

On October 25, 2018, Father filed a motion to set the matter for a final hearing in which he requested that the court order Mother to undergo a mental evaluation "due to the unstable behavior of [Mother] in the courtroom as well as outside of the courtroom." Notably, he recounted events from a recent overnight visitation during which Mother called the child and screamed at her; when Father cut off the phone call, Mother "called a total of 15 times from three different phone[] [numbers] to upset the [] child" and then called the sheriff's department to do a well child check. On October 26, Father filed a "Motion and Affidavit for Emergency Ex Parte Order and Petition for Emergency Custody," in which he requested "sole custody with primary residential placement be given to [him]" because both Mother and her then-husband, Mr. Smith, "are a threat to the physical and mental safety of the minor child." In particular, Father's petition alleged that Mother had obtained an order of protection against Mr. Smith based on her allegations that he was a heroin addict and self-mutilator who had made threats to kill the child. The petition also alleged that Mr. Smith had obtained an order of protection against Mother based on allegations that Mother had choked, physically attacked, threatened to stab, and stalked him and had also threatened to burn his belongings.

The trial court entered an ex parte order the next day awarding temporary custody to Father and setting the matter for a hearing approximately two weeks later. After that hearing, the court entered an order keeping Father as sole custodian and giving Mother video visitation every other night and allowing Mother's other children, but not Mr. Smith, to participate in the video calls. The order also provided that "Father may record these conversations and has the authority to end them should the mother say anything inappropriate." A subsequent hearing was held on December 6, after which the court entered a temporary custody order stating that sole custody would remain with Father, permitting him to enroll the child in the school that served his residence, and making him "solely responsible for the child's day-to-day care including all education decisions, all health care, dental and mental care needs."[1]

---

[1] Around this same time, the child's maternal grandparents sought emergency custody of her, alleging that "[Father] is an immediate threat to [the child] . . . due to his history of violent threatening behaviors"

Mother then petitioned for unsupervised visitation. Apparently, the trial court granted Mother visitation to be supervised by her parents because the record next contains a motion by the guardian ad litem seeking clarification from the trial court about the parameters of visitation. The motion stated that the maternal grandmother had contacted the guardian ad litem to express "that she was not comfortable supervising the visitation" between Mother and the child after she had contacted Mother "in order to establish ground rules for the visitation," at which point Mother "got extremely upset and sta[r]ted accusing [maternal grandmother] of being in a conspiracy with the GAL and [Father] to prevent her from seeing her daughter." The guardian ad litem requested that the court "clarify the rules for Mother's visitation." On December 31, 2018, the court ordered that Mother's supervised visitation was to take place every other weekend at the home of the maternal grandparents, who were to "provide eyes on-ears on supervision at all times"; that Mother "shall follow all of the rules/requests made by the grandparents"; and that Mother was allowed to have two phone calls per week with the child. The order also dismissed an order of protection that Father had obtained on the child's behalf against Mother, but left in place an order of protection preventing Mr. Smith from being around the child.

Two days later, on January 2, 2019, Mother filed the first of six petitions seeking custody of the child. On January 4, 2019, the trial court sua sponte temporarily suspended all visitation between the child and Mother as well as the maternal grandparents "[b]ased upon information received by this Court regarding events that occurred since the last Court date." The events referred to are not made clear by the court's order, nor does the testimony at the final trial shed light on what transpired. Mother's visitation was subsequently reinstated, to be supervised by "Debra Elkins Safe Family Visits" and paid for by Mother. The court ordered that the child attend mental health counseling at least once per month and that Mother and Father not be permitted to access her therapy records. The trial court later adjusted the visitation schedule so that the parents exercised week-on, week-off visitation during the summer, and when school started, Mother was to have parenting time every other weekend and on alternating Wednesdays after school.

A trial on all pending motions was held over five days; the first four took place in the fall of 2019, and the last was held on June 29, 2020. At trial, Father, Mother, maternal grandmother, and one of Mother's daughters testified. The trial court also interviewed the child in the presence of the guardian ad litem, the court's clerk, and the court reporter, but no transcript of that interview is contained in the record on appeal, as the transcript indicates that the trial court instructed that it was not to be transcribed. We will not tax the

---

and "bringing her around family members who have recent lengthy criminal records of drug use and violence." The grandparents subsequently moved to intervene, which the trial court permitted; however, the trial court denied their petition for emergency custody. The grandparents withdrew as intervening petitioners from the proceedings in March 2019 upon their "conclu[sion] that our role as intervenors has been of no effect so therefore is of no beneficial purpose in this case."

length of this opinion with a summary of all the testimony here; instead, we will discuss any relevant testimony in our treatment of the issues Mother raises.

After the fourth day of trial, at which troubling drawings by the child were submitted to the court by Mother, the trial court entered an order requiring a psychological evaluation of the child "to understand what [she] has been exposed to, including all the adult issues of rape, bullying, abortion, molestation, lying, abuse, suicide and cutting issues[,] as the Court wants to make sure she is not overwhelmed by these issues." The trial court also ordered the psychiatrist to "not disclose what the child sa[id] to either parent or give any record of sessions to either parent" and required that "both parents make appointments with same psychiatrist on separate dates." The order incorporated a temporary parenting plan that maintained Father's status as the primary residential parent and gave him 245 days of parenting time and Mother 120 days, to be exercised every other weekend and overnight on alternating Wednesdays. The court addressed some concerns Mother had raised by ordering that she was entitled to copies of school records and communication with the child's school and requiring Father to provide proof to the court that the child was up to date on medical, dental, and vision checkups.

During the interlude between the fourth and fifth days of trial, Mother filed a motion on November 15, 2019, seeking emergency custody of the child and that she be named primary residential parent, based on allegations that Father had purchased a phone for the child, and Mother, "to monitor usage and in searching the history on the phone," found "hundreds of searches for porn, searches for guns, ammo, [A]mbien, dating website logins, searches for reinstatement of revoked or suspended drivers licenses, division of marital property . . . ." As a result of the Internet search history, Mother contended that Father "has proven to be an unfit parent and a direct threat to his child" and that she "fear[ed] . . . that severe physical harm, sexual harm or death may come to our daughter." The trial court heard the motion and denied it but ordered that neither party should expose the child to pornography. This order also specified the mental health professional who should perform the child's psychological evaluation. Upon the guardian ad litem's subsequent motion, the trial court again ordered both parents to undergo a psychological assessment with a certain psychologist, who was different from the one who would be conducting the child's evaluation.[2]

The guardian ad litem filed a motion on April 8, 2020, requesting an ex parte restraining order and modification of the temporary parenting plan to limit Mother's parenting time due to comments Mother had made to the child concerning Mother's desire to harm or kill Father and reports that Mother had rekindled her relationship with Mr. Smith. The motion also stated that Father had separated from his wife and that he and the child were living in a new residence. That same day, the trial court granted the restraining

---

[2] For reasons unclear from the record, a licensed psychologist different than the one specified by the court performed Father's psychological assessment.

order, which prevented Mother from removing the child from Father's care and control or being around her unsupervised and also required Mother to not expose the child to Mr. Smith. After a hearing on April 22, at which the court heard testimony from Mother, Father, and the child, the trial court ordered that Mother's visitation shall be at Father's discretion and could not take place in Mother's home. The court required the parties to agree to visitation in writing on a weekly basis. If in-person visitation could not take place, Mother was entitled to video calls two times per week at her request.

At the conclusion of the trial in June 2020, the court made oral findings of fact and conclusions of law that day and at a subsequent hearing, prompted by the guardian ad litem's motion for additional findings of fact, pursuant to TENN. R. CIV. P. 52.01 and 52.02. The court entered a final order on August 18, 2020, in which it recounted the proof adduced at trial and made an adverse credibility finding as to Mother, noting that she "has lied to this Court on numerous occasions." The court found that a substantial and material change of circumstances had occurred, specifically "Mother's mental health" and the effect it was having on the child. In that regard, the court found that Mother "is unable to parent this child without causing damage, psychologically, and emotionally to [the child]." The court made findings relating to the best interest factors set forth at Tenn. Code Ann. § 36-6-106(a) and determined that Mother's parenting time should be limited pursuant to Tenn. Code Ann. § 36-6-406(d)(2) and (4). The court entered a new permanent parenting plan that named Father primary residential parent and gave Mother zero days of residential time but awarded her visitation at Father's discretion and to be supervised by him and allowed her to contact the child a minimum of two days per week. The court specified that "contact" meant "visitation, text messaging, phone calls and video calls" on two different days per week. The trial court also set child support for Mother at $429 per month, ordered each party to pay their own attorney's fees, and taxed the court costs equally to each party.

Mother appealed. While this case was pending on appeal but prior to oral argument, Mother petitioned the trial court on December 21, 2020, for emergency custody of the child, to be restored as primary residential parent, and for the recusal of the trial judge. The trial court continued the petition "indefinitely" until a Department of Children's Services investigation was completed and denied Mother's motion to recuse, finding that it was based on Mother's "disagreements with the prior decisions of the Court in this matter."

Mother raises 14 issues for our review, which we reproduce verbatim below:

1. Whether the trial court in this post-divorce action lacked jurisdiction to order sua sponte that custody of the minor child be changed from one parent to the other where no pleading requesting any change of custody was then pending before the trial court.
2. Whether assuming arguendo that the lack of any pleading seeking change of custody is not fatal to the trial court's jurisdiction, the trial

court wrongly ordered a change of custody in the absence of any finding of a material change in circumstances since the court's prior decree.

3. Whether the trial court's sua sponte action ordering a change of custody deprived the mother and child of fundamental constitutional rights without due process of law.

4. Whether this Court should construe the domestic relations exception of Rule 65.07 of the Tennessee Rules of Civil procedure to include notice and hearing requirements of due process in order to save such rule from constitutional invalidity.

5. Whether this Court should direct the proceedings on remand be had before a different trial judge.

6. Whether the trial court was proper in denying mother's parental rights and rights to visitation.

7. Whether appointment of or substitution of Guardian ad Litem is proper. Whether GAL be allowed to participate in appeal after withdrawing.

8. Whether mother and mother's children's personal and private information to include social security numbers, tax information, and medical records should have been sealed.

9. Whether Orders of protection against Mrs. Killian and Mr. Smith filed by Mr. Moore were proper and whether they should be sealed and whether while ordering Order of Protection against Mr. Smith if Court should have checked box for Mr. Smith to attend drug treatment.

10. Whether Order of protection against Mr. Moore by Mrs. Killian should have been transferred or denied.

11. Whether Mother should be reimbursed for unnecessary expenses incurred by paying for supervised visits without any basis and whether father should have to reimburse mother for cost of her Psychological evaluation that he requested.

12. Whether Mr. Moore [should] have access to any transcripts as court reporters and transcripts were paid for solely by mother and whether transcripts should be sealed.

13. Whether whole record should be sealed.

14. Whether it was proper that mother and father be denied the right to question minor child as a witness.

At the outset of our consideration of any of the issues Mother raises in this appeal, we are constrained to point out that both parties represented themselves at the final trial and on appeal. "It is well-settled that *pro se* litigants are held to the same procedural and substantive standards to which lawyers must adhere." *Brown v. Christian Bros. Univ.*, 428 S.W.3d 38, 46 (Tenn. Ct. App. 2013). This Court has held that "[p]arties who choose to represent themselves are entitled to fair and equal treatment by the courts." *Hodges v. Tenn. Att'y Gen.*, 43 S.W.3d 918, 920 (Tenn. Ct. App. 2000) (citing *Paehler v. Union Planters Nat'l Bank, Inc.*, 971 S.W.2d 393, 396 (Tenn. Ct. App. 1997)). Nevertheless, "courts must

not excuse pro se litigants from complying with the same substantive and procedural rules that represented parties are expected to observe." *Young v. Barrow*, 130 S.W.3d 59, 63 (Tenn. Ct. App. 2003) (citing *Edmundson v. Pratt*, 945 S.W.2d 754, 755 (Tenn. Ct. App. 1996); *Kaylor v. Bradley*, 912 S.W.2d 728, 733 n.4 (Tenn. Ct. App. 1995)).

The organization, or lack thereof, of Mother's brief does not assist our review, nor does the near-total lack of citation to the record for factual support of the allegations she makes.[3] Father's brief is equally unhelpful. Mother weaves a tangled web of arguments that is difficult to follow and devotes ample portions of her brief to attacking Father, the trial court, the guardian ad litem, and the psychologists on whose reports the trial court relied. However, she does not support her vitriol with citation to the record where proof may be found to validate her perception of what transpired. In our careful review of Mother's brief, we find that she makes no argument whatsoever with respect to issues 4, 7, 8, 9, 10, 11, 12, 13, or 14.[4] Therefore, she has waived any consideration of those issues by this Court. *See Childress v. Union Realty Co., Ltd.*, 97 S.W.3d 573, 578 (Tenn. Ct. App.

---

[3] Rule 6(b) of the Rules of the Court of Appeals provides:

> No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.

TENN. R. CT. APP. 6(b). Mother supported only a few statements in the argument section of her brief with citation to the record, but of those citations, most direct us to see the entire record or entire transcript and therefore do not comply with Rule 6(b). The other citations are to pages of the record that do not support the assertion she makes. Her brief ends with a list of excerpts of trial testimony, with their location in the record, but provides no context for what arguments, if any, Mother contends are supported by these snippets of testimony. We are under no duty to search a record to determine whether testimony exists to substantiate her various arguments on appeal. *Davis v. Hall*, 920 S.W.2d 213, 216 (Tenn. Ct. App. 1995). To do so would put us in the position of serving as her advocate, which is not our role.

[4] With respect to Issue 9, in her brief's statement of the case, Mother asserts that Father was granted an order of protection on the child's behalf against Mother and Mr. Smith but asserts that he should not have been permitted to secure one since Mr. Smith's connection to Father fell outside the statutory definition of a domestic relationship. She does not, however, articulate any argument on this front in the actual argument section of her brief, nor does she discuss why she believes this order should have been sealed or why the available checkboxes for drug treatment should have been checked by the court. Mother's failure to construct an argument regarding her position that the trial court erred in its treatment of an order of protection constitutes waiver of the issue; accordingly, this aspect of her appeal is meritless. *See Newcomb v. Kohler Co.*, 222 S.W.3d 368, 400-01 (Tenn. Ct. App. 2006).

With respect to Issue 10, though Mother references various orders of protection in her brief, she fails to cite to their location in the record or explain how the trial court erred in its treatment of any particular order of protection. As with Issue 9, Mother has waived our consideration of this issue. *See Newcomb*, 222 S.W.3d at 400-01.

2002) ("[W]hen a party raises an issue in its brief, but fails to address it in the argument section of the brief, we consider the issue to be waived."). The remaining issues in Mother's brief focus on whether the trial court was without jurisdiction to order a change in primary residential parent, whether the proceedings below impinged her due process rights, whether the change in primary residential parent status and modifications to the visitation schedule are supported by the evidence, and whether the trial court should have recused itself. Father raises no additional issues for our consideration.

ANALYSIS

Our review in this non-jury case is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan,* 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon Cty. Bd. of Educ.,* 58 S.W.3d 706, 710 (Tenn. 2001).

*1. Jurisdiction (Mother's Issue 1)*

Mother first challenges whether the trial court had jurisdiction to hear the case, asserting that the court sua sponte changed custody (also referred to as "primary residential parent" status) to Father and that it lacked jurisdiction to do so because there was no pleading before it seeking such a change. Mother also questions, in passing, whether the Wilson County Circuit Court had the authority to adjudicate the matter when the divorce was entered by a Davidson County court.

"Subject matter jurisdiction implicates a court's power to adjudicate a particular case or controversy." *McQuade v. McQuade*, No. M2010-00069-COA-R3-CV, 2010 WL 4940386, at *4 (Tenn. Ct. App. Nov. 30, 2010) (citing *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004)). Without subject matter jurisdiction, a court cannot enter a valid, enforceable order." *Id.* (citing *Brown v. Brown*, 281 S.W.2d 492, 497 (Tenn. 1955)). Therefore, "subject matter jurisdiction may be raised at any time by the parties or by the appellate court *sua sponte* on appeal." *Graham v. Graham,* No. E2008-00180-COA-R3-CV, 2009 WL 167071, at *6 (Tenn. Ct. App. Jan. 26, 2009) (citing *Cnty. of Shelby v. City of Memphis*, 365 S.W.2d 291, 291 (Tenn. 1963)). When the issue of subject matter jurisdiction is raised, we first determine the nature of the case and then ascertain whether the Tennessee Constitution, the Tennessee General Assembly, or the common law have conferred on the court the power to adjudicate the case before it. *Staats v. McKinnon*, 206 S.W.3d 532, 542 (Tenn. Ct. App. 2006). Whether a court has jurisdiction is a question of law, and thus, on appeal, the issue is reviewed de novo with no presumption of the correctness of the ruling of the lower court. *Button v. Waite*, 208 S.W.3d 366, 369 (Tenn. 2006).

There is no question that, generally, circuit courts are vested with the power to adjudicate divorces. Tenn. Code Ann. § 16-10-108. Normally, the court that granted a divorce (in this case, the Davidson County Circuit Court) retains exclusive jurisdiction over that decree and any subsequent custody disputes. Tenn. Code Ann. § 36-6-101(a)(1); *see also* Tenn. Code Ann. § 36-6-217. However, Tenn. Code Ann. § 36-5-3003 provides that "a case that includes child support or custody provisions may be transferred between counties in this state" and sets forth the procedure for doing so. Father complied with the transfer procedure in this case, and while Mother stated that she never received notice of the transfer such that she could have objected to it, she would not have prevailed on such an objection, as there is no dispute that neither party currently resides in Davidson County. *See* Tenn. Code Ann. § 36-5-3007. Accordingly, the transfer of the case to the Wilson County Circuit Court was proper.

Mother's argument that the court was without jurisdiction to order a change in custody is focused on the fact that Father's October 2017 petition sought only an increase in his parenting time and a reduction in his child support. Thus, she argues, his petition provided no basis for the court to designate Father as primary residential parent.

Her position is without merit, as Father filed an emergency petition requesting "sole custody with primary residential placement" of the child necessitated by Mother's allegations in a petition for an order of protection that the child could be hurt or killed by her step-father. The court granted Father's petition in an ex parte order and designated him as primary residential parent, with the court specifying that the change in status was temporary, requiring further review and consideration. Mother herself then filed no fewer than six petitions seeking to be named primary residential parent. The petition Father filed is a bit unclear; though Father requested "sole custody with primary residential placement," he also requested "temporary custody" in his prayer for relief. He never amended his petition to clarify that he sought full, permanent custody. However, the parties conducted themselves as if each were seeking permanent custody, such that the issue was tried by consent. *See In re Z.A.W.*, No. W2005-01956-COA-R3-JV, 2006 WL 1627180, at *3 (Tenn. Ct. App. June 12, 2006). "Rule 15.02 of the Tennessee Rules of Civil Procedure provides that issues tried by express or implied consent shall be treated in all respects as if they had been raised in the pleadings." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). Further, in its April 4, 2019 order, the court stated that it was denying Mother's Motion to Restore Permanent Custody to Mother but "will determine custody at the final hearing in this matter." Mother cannot claim that the designation of primary residential parent was not before the court, as she stated at trial that she was "under the impression" that the trial was being held to determine when the temporary custody arrangement would end and which parent would have permanent custody, which the trial court confirmed. The parties both sought custody of the child, and thus the court had jurisdiction to rule on that matter.

### 2. *Due process (Mother's Issue 3)*

Related to her position that the court sua sponte ordered a change in primary residential parent status, Mother asserts that the court deprived her of fundamental constitutional rights without due process. Specifically, she argues: "The emergency (temporary) change in custody ordered by the trial court was accomplished with no notice to Mrs. Killian that such an issue was on the table. The mother consequently was not afforded a meaningful opportunity to obtain and present evidence on any issue of changed circumstances."

Notice and a meaningful opportunity to be heard are essential components of procedural due process. *Manning v. City of Lebanon*, 124 S.W.3d 562, 566 (Tenn. Ct. App. 2003). Our Supreme Court has held that "[i]t is imperative . . . that a party from whom custody will be removed, even temporarily, be provided with notice sufficient to meet due process requirements." *Keisling*, 92 S.W.3d at 380.[5] In *Keisling*, the trial court temporarily changed custody from mother to father when only an oral motion seeking that result had been made by the father at a hearing. *Id.* at 376-77. The Supreme Court determined that the change in custody was a violation of the mother's due process rights, as there was no notice that custody could be changed and it was not expressly or impliedly tried. *Id.* at 379-80. However, since the decision in *Keisling* was rendered in 2002, the Legislature added the following provision to Tenn. Code Ann. § 36-6-405 in 2010, which deals with modification of permanent parenting plans:

> In a proceeding for a modification of a permanent parenting plan, the existing residential schedule shall not be modified prior to a final hearing unless the parents agree to the modification or the court finds that the child will be subject to a likelihood of substantial harm absent the temporary modification. If a temporary modification of the existing residential schedule is granted ex parte, the respondent shall be entitled to an expedited hearing within fifteen (15) days of the entry of the temporary modification order.

Tenn. Code Ann. § 36-6-405(b).

---

[5] In *Keisling*, the Court noted the three factors that should be considered in determining the procedural protections warranted by a particular situation:

> "(1) the private interest at stake; (2) the risk of erroneous deprivation of the interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

92 S.W.3d at 377-78 (quoting *State v. Culbreath*, 30 S.W.3d 309, 317-18 (Tenn. 2000)).

In this case, Father filed a motion with the court seeking custody of the child due to alarming allegations Mother had made in a petition for an order of protection concerning threats on the child's life by Mother's then-husband. The trial court found that "an immediate and present risk of physical danger or psychological harm" existed and that it was in the best interest of the child to designate Father as primary residential parent. This change was made on an ex parte basis due to the exigent circumstances surrounding the perceived risk to the child from being in Mother's home with Mr. Smith. The court held a hearing within the 15-day period set forth in the statute, and Mother attended and participated.[6] Given the gravity of the situation, the initial, temporary change in custody comported with Tenn. Code Ann. §36-6-405(b) and did not violate Mother's due process rights.

Further, Mother petitioned the court on no less than six occasions to make her primary residential parent. The transcripts from the final trial make clear that the court heard evidence over the course of multiple days and that Mother fully participated by testifying and by calling and questioning witnesses.[7] The record belies Mother's assertion that she was not afforded a meaningful opportunity to obtain and present evidence on the issue. There was no denial of due process.

### 3. Change in Primary Residential Parent Status (Mother's Issues 2 and 6)

This case is ultimately about a change in child custody—a statutory term courts have equated to the designation of a "primary residential parent." *Armbrister v. Armbrister*, 414 S.W.3d 685, 703 (Tenn. 2013). When considering a motion to modify child custody, the threshold question a court must answer is whether there has been a material change in circumstances since the entry of the existing parenting plan. *See C.W.H. v. L.A.S.*, 538 S.W.3d 488, 496 (Tenn. 2017); *see also Armbrister*, 414 S.W.3d at 705.

"A material change of circumstance does not require a showing of a substantial risk of harm to the child." Tenn. Code. Ann. § 36-6-101(a)(2)(B)(i). Rather, "[a] material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no

---

[6] The hearing occurred on the sixteenth day following the entry of the ex parte order, but we take notice that the courts were closed in observance of Veteran's Day on one of the intervening days, such that the hearing was timely held. *See* TENN. R. CIV. P. 6.01.

[7] This case bears strong resemblance to the situation in *Howe v. Howe*, in which the mother complained that she did not know custody was in issue. This Court distinguished the facts from those in *Keisling* and found the mother's argument to be "disingenuous, however, since the parenting issues were hotly contested from the very beginning, as evidenced by the voluminous pleadings filed prior to trial" and noted that "the issue of custody was a constant theme throughout the entire trial, and most of the mother's testimony seemed directed toward painting the father as a 'bad person.'" No. E2008-02580-COA-R3-CV, 2010 WL 323068, at *3 (Tenn. Ct. App. Jan. 28, 2010).

longer in the best interest of the child." *Id.* The party seeking to modify the existing parenting plan bears the burden to prove this material change by a preponderance of the evidence. *Id*. If a court finds there has been a material change in circumstances, then it must decide whether modification of the parenting plan is in the child's best interest. If the court finds that there has been no material change in circumstances, it "'is not required to make a best interest[ ] determination and must deny the request for a change of custody.'" *Pippin*, 277 S.W.3d at 405 (quoting *Caudill v. Foley*, 21 S.W.3d 203, 213 (Tenn. Ct. App. 1999)).

Whether a material change in circumstances has occurred is a factual question and one that appellate courts presume the trial court correctly determined unless evidence in the record preponderates otherwise. *Armbrister*, 414 S.W.3d at 692-93; *see also* Tenn. R. App. P. 13(d). No "bright line" test exists for determining whether a material change of circumstances has occurred. *McClain v. McClain*, 539 S.W.3d 170, 188 (Tenn. Ct. App. 2017) (quoting *Oliver v. Oliver*, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr. 26, 2004)). However, the reviewing court can consider the following principles in making this determination:

> "First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that affect the child's well-being. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. Fourth, the change in circumstances must affect the child's well-being in some material way."

*Canzoneri v. Burns*, No. M2020-01109-COA-R3-CV, 2021 WL 3399860, at *6 (Tenn. Ct. App. Aug. 4, 2021) (quoting *McClain*, 539 S.W.3d at 188). "Not every change in circumstance is a material change." *Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *5 (Tenn. Ct. App. Dec. 9, 2015). "'The change must be significant before it will be considered material.'" *Id.* (quoting *In re T.C.D.*, 261 S.W.3d 734, 744 (Tenn. Ct. App. 2007)).

With regard to our review of a court's decision on a petition to modify a permanent parenting plan, the Tennessee Supreme Court has stated:

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. Thus, determining the details of parenting plans is peculiarly within the broad discretion of the trial judge. It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court. A trial court's decision regarding the

details of a residential parenting schedule should not be reversed absent an abuse of discretion. An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.

*Armbrister*, 414 S.W.3d at 693 (alterations and omission in original) (citations and quotation marks omitted); *see also Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014).

Mother argues that "the trial court made no finding of changed circumstances but nonetheless ordered a change of custody; this ruling contravenes settled law." Mother's characterization of the trial court's ruling is incorrect. The trial court's order made an explicit finding of changed circumstances: "[t]he court finds that there has been a substantial and material change of circumstances since the parties' final divorce . . . . The significant changes that the Court finds mainly would be Mother's mental health, and the effect thereof . . . ." Mother implicitly recognizes the existence of this finding when she argues later in her brief that "there is no proof in the record that there has been any change in mother's mental health as there was no baseline mental health evaluation to compare" and also that "father testified throughout the whole record about mother's mental health stating that it has been an ongoing thing[;] therefore there has been no change in mother's mental health." She goes on to argue that "[t]he only significant changes in circumstances are that since the parties' divorce, both parties were remarried and subsequently divorced and both parties have moved residences." Mother cites to no specific evidence in the record to support these arguments or to preponderate against the court's findings.

We first examine whether the evidence supports the court's conclusion that Mother's mental health issues constituted a material change in circumstances occurring since the entry of the 2011 final decree of divorce. *See Keisling v. Keisling*, 196 S.W.3d 703, 719 (Tenn. Ct. App. 2005) ("Though temporary custody orders may be entered after the entry of the final decree, a change in circumstances is measured from the final order of custody under which the parties are currently operating."); *see also Spatafore v. Spatafore*, No. E2001-02459-COA-R3-CV, 2002 WL 31728879, at *2 n.1 (Tenn. Ct. App. Dec. 5, 2002) (measuring a change in circumstances from entry of the final decree of divorce, despite the existence of an order temporarily changing custody).

Pertinent to the issue of Mother's mental health, Mother testified that she experienced trauma when her best friend was murdered in June 2012. The month prior to her friend being murdered, Mother had obtained an order of protection against Father "because [Father] was stalking [her], threatening [her], harassing [her]." Mother later testified that she is "still in fear" and "incredibly paranoid" and worries "that there are cameras in her house." The report of the psychologist who examined Mother states that she exhibited "significant persecutory ideation, such as a belief that others seek to harm her," making her suspicious of others. He diagnosed her with "Unspecified trauma- and stressor-

- 13 -

related disorder" and "paranoid personality features." This evidence establishes that, after the entry of the final decree of divorce and parenting plan, Mother experienced trauma and developed paranoia.

Father testified that he was concerned about what the child was being exposed to and the effect on her of Mother's inappropriate behavior and paranoia. The evidence showed that Mother refused to let Father have overnight visitation after their divorce as a result of her beliefs that he had raped Mother while she was taking sleeping medication and that his son, who did not live in Father's home, was a child molester. She continued to call Father a "rapist" at trial, and Father testified that he refused to "stay within [Mother's] presence, because being called a molester and a rapist . . . is not healthy for me [. . . and] makes me uneasy because of the accusations [she] ha[s] made in the past." In *Keisling*, this Court noted that harm can result to a child "when a parent's natural and expected protectiveness regarding the prospect of sexual abuse by the other parent goes beyond reason, becoming obsessive hypervigilance. If permitted to continue, the consequence can be lasting psychological damage to the child and the destruction of a normal parent-child relationship." 196 S.W.3d at 723 (citing *B.M.M. v. P.R.M.*, M2002-02242-COA-R3-CV, 2004 WL 1853418 (Tenn. Ct. App. Aug. 18, 2004)). In this case, that harm had been realized. Mother testified that her relationship with the child had become "strained," and both parents reported some concerning comments and behavior from the child, which each attributed to the other parent's influence, character, and poor parenting skills. The evaluation of the psychologist who examined the child states that she "likely needs increased treatment focused on how to specifically cope with her mother's mental health and establish boundaries."

Father testified about other examples of the effects of Mother's behavior, such as Mother's children being dismissed as patients from their pediatrician's practice in 2016 due to Mother's harassing behavior toward the staff and threats of lawsuits and complaints to governing boards. Father said he "do[es]n't know why [Mother] thinks that everybody is going to molest the children or do inappropriate things with the children." Father also discussed an incident in 2014, when he took the child out to eat for her birthday, and Mother and her other children came along. Mother was dissatisfied with the length of time it took to get their food and the temperature of the food when it arrived, and she yelled at the waitstaff and turned over a plate of food, with the result that she was asked to leave the restaurant or else the police would be called. He also was concerned by Mother's statements to the child that the custody litigation was making Mother poor, such that she would not be able to afford a house or car.[8]

---

[8] Relative to Father's concerns that she was sharing inappropriate information about her finances with the child, Mother testified that "as far as having money, every time I see [the child], it's buy me this, buy me this, I want that; take me here . . . and I have every right to tell my kid, hey I'm not going to do it, or hey, I don't have the money for that, can't afford it. . . . [T]hat is, like, perfectly appropriate. Apparently [Father] doesn't think that's appropriate."

Father also recounted Mother's behavior at an April 2018 hearing when the child was being interviewed by the judge. He testified that Mother "became agitated" and "frustrated" and began clicking a pen. When court staff told her to stop, she did it "three more times, and they got onto her." Mother then attempted to leave the courtroom to go to the bathroom, and a deputy escorted her out of the room. Mother made a crass remark to the deputy and then went to the clerk's office, asking to see some records. Shortly thereafter, the Lebanon Police arrived, apparently because Mother had informed them she and her daughter were in distress and the judge was holding her daughter hostage. As a result of those events, the trial court gave Father overnight visitation, during which Father testified that Mother made "continuous phone calls" to the child in which he could hear Mother "using cuss words and swearing."

During her testimony, Mother recounted her version of the same event and stated that her decision to call 911 that day "d[id]n't have anything to do with [her] parenting at all" but was about being "forced" to remain in the courtroom. She explained that things escalated when she asked to see "our divorce file" but court staff "tried to force her to sit in this room," which made her "incredibly uncomfortable." A court staff member "told [her] to call 911." Mother testified that her "blood pressure was through the roof" and that she received "medical treatment from the EMTs" who were dispatched to the scene.

The final order contains the trial court's account of those events:

> The Court finds that even here as this Court was interviewing this child, and the Court was not alone at that time, Ms. Casey, the child's previous Guardian ad Litem, was in there and so was the Court's clerk, Tonya[.] [The child] was not alone, but when we interviewed [her], Mother called the S.W.A.T team on us, stated that the Judge kidnapped her child. She knew very well that [the] child was in the next room. She saw the child go in there with the Judge. The Court is sure she could hear us talking in the background. Mother could not hear what we were saying, but she knew we were in there with her, and that [the] child was not in any harm, but went to the clerk's office, demanded to speak to the police to report that the Judge had kidnapped her child. When we brought [the child] out of the jury room where we interview the children, here we have police officers out here waiting on us. If that is not evidence of a mother that has problems with paranoia and has problems with feeling like she is always being persecuted, that is a perfect example.

In addition to the change in circumstances regarding Mother's mental health, Mother had remarried. In *Armbrister*, the Tennessee Supreme Court held that the possible change in home environment caused by a parent's remarriage is a factor to be considered in determining whether or not there has been a material change in circumstance, as "[t]he character, attitude and general personality of other persons who would be in a position to

- 15 -

influence the children are important considerations for the court." 414 S.W.3d at 705 (internal quotations omitted). Father sought custody of the child based on his fear for her safety, given the allegations Mother made in seeking an order of protection against her then-husband on behalf of herself and her daughters. Mother alleged, among other things, in the petition that he had threatened to harm or kill the child. When questioned about the order of protection at trial, Mother testified that she got it "to protect my family" because at the time, "she was fearful" and "very scared"; however, she realized "after the smoke cleared . . . [that] he's not a direct threat to me or my family." Mother characterized Mr. Smith's behavior as "kind of a little off and kind of unpredictable." When asked if he had ever been inappropriate or violent with her children, Mother testified that he had never been violent, but that he had exposed himself to her daughters while changing clothes, which she tried to minimize by stating that "he actually had something [on] under his pants." She also testified that Mr. Smith used to "bicker" with the child and her sister, but "it wasn't really actually like . . . they were in harm's way." Mother also testified that Mr. Smith crashed his car into Mother's mailbox on one occasion and garage on another, and that he jumped out of her moving car on purpose.

Mother was questioned about the numerous allegations she made in her petition for an order of protection from Mr. Smith and explained that much of it she either exaggerated or had no firsthand knowledge of, but had been informed of by Mr. Smith's paramour, who was pregnant with his child at the time. She testified as follows during questioning by the guardian ad litem:

Q. You put on here [Mr. Smith] assaulted me by tackling me in my driveway in front of my children this week and said if I called the police, he would say he had a weapon and try to get the police to shoot him. Did that happen or not happen?

A. So he -- I have his phone. So he tackled me to get it. So he did try to get the phone. Well, I don't really know that he tackled me. I guess I should say he came at me to get the phone. And I was wearing, you know, the slides that have the velcro across. And so the shoe kind of went and I fell. And then – I'm sorry. What was the rest of that?

Q. He said if I called the police, he would say he had a weapon and try to get the police to shoot him.

A. He did say that. And my kids actually didn't see it. They were home. They didn't see it. I thought they might have.

Q. Were they in the house?

A. They were in the house, and we were outside, yeah. So I think they came around the corner maybe after that, but they didn't see that because then one of them asked me why my pants were dirty like it made a -- like because when my shoe broke and I fell on my butt, I got like a dirt mark or whatever. So they asked me about that, I didn't -- I didn't actually tell them what happened. Maybe they put two and two together. Maybe not. . . .

- 16 -

Q. You have put on here he has recently threatened to hurt or kill my nine-year old and twelve-year old, and they have videoed said threats. Did that happen?

A. They were saying that he -- they were saying -- I think [Father] brought this up at some point that they were saying we're keeping a journal, and [Mr. Smith] is threatening to kill us and we're taking videos.

Q. To your knowledge, have you ever seen any videos or heard any threats from [the child] or [one of her half-sisters] that Mr. Smith was going to harm them in any way?

A. No. And I actually – I'm about ninety-nine percent sure that neither one of them is scared of him. You know, they would get in the car. They would live with him. They talked to him. You know, when he wasn't, you know, in a bad mood or whatever, they would -- I mean, they would interact with him just like – you know, he would go places with us like a family. And you know, there was never a real like threat to them or a real fear that they had.

Mother testified that Mr. Smith moved out of her house in October 2018, and she then had the order of protection dismissed because it "ended up causing just problems instead of actually being helpful." They divorced the following February. Mother testified that Mr. Smith had been back to her residence since the order of protection was dismissed, and that she had seen him and "talked to him some" though she could not specify any dates. She also testified that he still had access to a truck that she owned, per the terms of their divorce, and the trial court recounted the child's statements that she had seen Mr. Smith on several occasions at her mother's house. Father also testified that the truck would come and go at Mother's house.

The case of *Canzeroni v. Burns* is instructive in this situation. In that case, the father petitioned to be made primary residential parent due a domestic violence incident between the mother and her husband, who had threatened to harm the children; the children did not witness the altercation, as they were with the father at the time of the incident. 2021 WL 3399860 at *1-2. The mother obtained an order of protection for herself and the children and divorced the stepfather. *Id.* at *3. After a trial, the trial court held that such an incident did not constitute a material change of circumstance that necessitated a change in primary residential parent status because the children were not present for the altercation, and even the petitioning father agreed that the mother handled the situation appropriately. *Id.* at *7. This Court affirmed the court's conclusion that no material change of circumstance occurred. *Id.* at *8. Unlike that case, Mother married a man whose addiction caused erratic and unsafe behavior in and around her home to which the child was exposed; though Mother subsequently divorced him, the testimony at trial showed that Mr. Smith's presence was still apparent, given the testimony concerning the comings and goings of a truck he shared with Mother.

- 17 -

Given the court's adverse credibility finding,[9] we are left with the conviction that the evidence does not preponderate against the trial court's finding that a material change in circumstance has occurred. Since the time of the divorce, Mother's mental health—evidenced by her paranoia and lack of judgment—has affected the child in material ways. She was dismissed from her pediatrician's practice. Her Mother's remarriage caused the child to live with a drug addict who yelled and bickered with children, behaved bizarrely, crashed his car into Mother's mailbox and garage, assaulted Mother while the child was at home and heard the altercation, threatened to kill himself and others, including the child. He still has contact with Mother. Mother seemed willing to downplay the effect of the behaviors of Mr. Smith on the child, but she had previously prevented Father from having overnight visitation with the child as a result of her fear of the child being around Father and his son. The evidence also shows that, since the 2011 entry of the plan, Mother experienced significant trauma and believed that Father was stalking her, resulting in continuing paranoia that affects many aspects of her life, but most importantly, her relationship with the child. On the record presented, the evidence does not preponderate against the court's finding that a material change of circumstance affecting the well-being of the child had occurred.

We next turn to the court's best interest determination. Mother argues that "the trial court also made no comparative fitness analysis vis-a-vis [Father] and [Mother]" and that the court failed to make findings of fact prior to ordering a change in custody. Mother's characterization of the court's order is wrong. The court engaged in a detailed discussion of the evidence and made findings in light of each factor set forth in Tenn. Code Ann. § 36-6-106(a), including the parties' moral, physical, mental, and emotional fitness, as set forth in subsection (a)(8). The trial court determined whether each factor weighed in favor of one parent or the other. It found that factors (2), (6), (7), (8), (9), (10), (11), (12), (13), and (14) all favored Father, and that factors (4) and (5) were neutral. The court found that factor (3) did not apply. With respect to factor (1), the strength, nature and stability of the child's relationship with each parent, the court found that Mother was the primary custodian until the fall of 2018, that both parents had the physical and mental capacity to provide for the child's needs, though Mother had "prevented Father from seeing the child overnight until the fall of 2018" and that "Mother, at this time, does not have the ability to provide for the child's emotional security and her psychological development." Thus, the trial court implicitly found that the evidence pertinent to this factor favored Father.

---

[9] "The trial court was, of course, in the best position to observe the demeanor of the witnesses and to assess their credibility. Consequently, we are loathe to second-guess the trial court's determination of credibility." *Keisling*, 196 S.W.3d at 721 (citing *Rutherford v. Rutherford*, 971 S.W.2d 955, 956 (Tenn. Ct. App. 1977)).

Mother does not challenge the trial court's best interest determination in her statement of the issues, but in the argument section of her brief, she challenges the court's factual findings with respect to the statutory factors by making sweeping assertions that they are "merely an opinion of the court without merit" or by attempting to refute them with the same troubling allegations against Father and his family that she has made throughout the proceedings below and on appeal. She does not cite to any location in the record where proof to substantiate her assertions can be found.

We have reviewed the evidence in the record. Despite the existence of conflicting evidence in the record, the testimony does not preponderate against those found by the trial court. *See Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999) (noting that "for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.") Our review of the record leads us to the conclusion that this case is remarkably similar to *Howe v. Howe*, in which:

> The Trial Court had to sift through a great deal of disparaging information about both parents . . . . The Court determined that the mother's credibility was questionable, and that she would likely thwart the child's relationship with the father in spite of the Court's orders, while the father was more likely to follow the Court's orders, and that the child's best interest would be served by naming the father primary residential parent.

2010 WL 323068, at *4. The trial court reached a similar conclusion in this case, which is supported by the evidence. Mother testified that Father was "adamant about not co-parenting"; "consistently sends threatening texts and harassing texts"; is "trying to keep [the child] away from me"; and is "on a power trip now [ . . . that] has nothing to do with what's best for our child." While Mother spent most of her testimony attacking Father, Father testified at length about the child, her interests, their shared activities, and that his relationship with the child was improving after many years of having no regular visitation besides eating lunch with her at school. He said that he "want[s] [the child] to have a relationship with her mother." On the final day of trial, both parties testified at length about recent weekly visits and how smoothly things had been going. Ultimately, the evidence supports the court's conclusion that it was in the child's best interest for Father to be named primary residential parent.

Giving ample consideration to the arguments Mother makes, it is clear that the parenting plan entered by the court does not allow her the unfettered access to the child she desires, but we do not agree with Mother that her parental rights have been "denied." While "[a] termination of *all* visitation has the practical effect of terminating the parent-child relationship," *Melvin v. Melvin*, 415 S.W.3d 847, 851 (Tenn. Ct. App. 2011), that was not the case here. The trial court restricted Mother's visitation briefly at times when the child's safety was in jeopardy or when Mother had not complied with the trial court's visitation

orders. Visitation was quickly reinstated in line with the statutory mandate to award visitation "sufficient to maintain the parent-child relationship." *In re Z.A.W.*, 2006 WL 1627180, at \*4 (citing Tenn. Code Ann.§ 36-6-301).

In the permanent parenting plan, Mother was awarded twice weekly contact, to be supervised by Father. "[A] noncustodial parent's visitation 'may be limited, or eliminated, if there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *Suttles v. Suttles,* 748 S.W.2d 427, 429 (Tenn. 1988)). Such a decision must be supported by specific findings that visitation by the non-custodial parent will result in physical, emotional, or moral harm to the child. *Melvin*, 415 S.W.3d at 851. In modifying the permanent parenting plan to limit Mother's parenting time as it did, the court considered Tenn. Code Ann. § 36-6-406(d)(2) and (4), which read:

> (d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing: . . .
>
> > (2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402[10]; . . .
> >
> > (4) The absence or substantial impairment of emotional ties between the parent and the child[.]

Tenn. Code Ann. § 36-6-406(d)(2), (4). In light of these statutory provisions, the trial court found:

> Mother's emotional impairment interferes with her performance of parenting responsibilities, specifically, ensuring [the child]'s own mental health and emotional safety. Mother has not maintained a relationship with [the child] that encourages and protects her emotional development. Therefore, said interference in [the child]'s emotional safety has damaged [the child]'s and Mother's emotional ties pursuant to T.C.A. § 36-6-406(d)(4). This conflict has created a situation where [the child] does not feel

---

[10] Parenting responsibilities, as defined in Tenn. Code Ann. § 36-6-402, include providing for the child's emotional care and stability, "including maintaining a loving, stable, consistent, and nurturing relationship with the child," as well as providing for the child's physical care and assisting the child in developing and maintaining appropriate interpersonal relationships. Tenn. Code Ann. § 36-6-402(2)(A), (B), (D). Parenting responsibilities also include "[e]xercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances." *Id.* at § 36-6-402(2)(E).

emotionally safe with her mother. She has learned to not be open about her feelings, and [the child] needs to have increased therapy to help her specifically cope with her mother's mental health and establish boundaries.

Mother has not specifically challenged these findings. From our review of the record, we conclude that the evidence does not preponderate against them; moreover, they provide a proper basis to limit Mother's parenting time.

In summary, the evidence in the record does not preponderate against the trial court's findings relating to the material change in circumstances, the individual statutory factors, or its ultimate conclusion that a modification of custody was in the child's best interest. Nor do we discern an abuse of the court's discretion in permitting Mother supervised visitation at the discretion of Father, at a minimum of two days per week. Accordingly, we affirm the judgment of the trial court modifying the permanent parenting plan.

### 4. Bias/Recusal (Mother's Issue 5)

Mother attempted to have the trial court recuse itself four months after the final order was entered on the basis that the court "has not remained neutral or impartial" and "has ignored all accusations and proof of abuse and neglect." The trial court denied the motion on the basis that it "did not contain any statutory grounds for recusal and the matters alleged therein were disagreements with the prior decisions of this Court in this matter," which are the subject of the instant appeal. Mother asks this Court to have the case reassigned to a different judge upon remand, arguing that the trial court was biased against her.

Mother may disagree with the rulings of the trial court, but "'[a] trial judge's adverse rulings are not usually sufficient to establish bias.'" *Duke v. Duke*, 398 S.W.3d 665, 671 (Tenn. Ct. App. 2012) (quoting *State v. Cannon*, 254 S.W.3d 287, 308 (Tenn. 2008)). Attempting to bolster her position on appeal, Mother argues that the trial court was biased because it "misapplied fundamental, rudimentary legal principles" in a way that favored Father.

"'[O]ne of the core tenets of our jurisprudence is that litigants have a right to have their cases heard by fair and impartial judges.'" *Keisling*, 92 S.W.3d at 380 (quoting *Davis v. Liberty Mut. Ins. Co.*, 38 S.W.3d 560, 564 (Tenn. 2001)). A party wishing to challenge a judge's impartiality "'must come forward with some evidence that would prompt a reasonable, disinterested person to believe that the judge's impartiality might reasonably be questioned.'" *Duke*, 398 S.W.3d at 671 (quoting *Eldridge*, 137 S.W.3d at 7-8). The process to seek recusal of a trial judge is set forth in Tennessee Supreme Court Rule 10B:

Any party seeking disqualification, recusal, or a determination of constitutional or statutory incompetence of a judge of a court of record, or a judge acting as a court of record, shall do so by a written motion filed promptly after a party learns or reasonably should have learned of the facts establishing the basis for recusal. The motion shall be filed no later than ten days before trial, absent a showing of good cause which must be supported by an affidavit. The motion shall be supported by an affidavit under oath or a declaration under penalty of perjury on personal knowledge and by other appropriate materials. The motion shall state, with specificity, all factual and legal grounds supporting disqualification of the judge and shall affirmatively state that it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. A party who is represented by counsel is not permitted to file a pro se motion under this rule.

TENN. SUP. CT. R. 10B. § 1.01. We engage in a de novo review of the court's decision on a motion to recuse. TENN. SUP. CT. R. 10B § 2.01.

Mother's motion for the trial court to recuse itself is found at the end of a petition for emergency custody. Procedurally, the motion did not comply with Rule 10B, as Mother did not support the motion with an affidavit and failed to state that the motion was not being presented for any improper purpose. Further, the motion was not promptly filed, as contemplated by the rule; Mother filed it on December 21, 2020, four months after the court entered its final order and therefore long beyond the time Mother would have been made aware of the facts which she contends provide a basis for recusal. "'[R]ecusal motions must be filed promptly after the facts forming the basis for the motion become known, and the failure to assert them in a timely manner results in a waiver of a party's right to question a judge's impartiality.'" *Duke*, 398 S.W.3d at 670 (quoting *Kinard v. Kinard*, 986 S.W.2d 220, 228 (Tenn. Ct. App. 1998)). Her delay in filing the motion waives her right to question the trial court's impartiality.

Even if Mother had promptly filed the motion, she failed to specifically state the factual and legal grounds supporting disqualification of the trial court. The entirety of the motion reads: "Judge Byrd has not remained neutral or impartial. Judge Byrd has ignored all accusations and proof of abuse and neglect. Judge Byrd should recuse herself due to not being objective in [this] case." On appeal, Mother also states that the court's "misapplication of the applicable law is compounded by the demonstrably [sic] falsity of certain of the trial court's statements." As support for this statement, Mother instructs this Court to "see [the] entire transcript." Such a citation is inadequate and unhelpful. *See* TENN. R. CT. APP. 6(b). Mother has failed to provide evidence that would prompt a reasonable, disinterested person to believe that the judge's impartiality might be reasonably questioned. Accordingly, her arguments in this regard are without merit, and reassignment to a different judge is unwarranted.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Kendra C. Killian, for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE